**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                   :

**In re**                               :        **Chapter 11**
                                   :

**WHX Corporation,**                 :        **Case No. 05-11444 (ALG)**
                                   :

             **Debtor.**         :

------------------------------------------------------------ x

---

**SECOND AMENDED DISCLOSURE STATEMENT**

**WITH RESPECT TO CHAPTER 11 PLAN OF REORGANIZATION**

**OF WHX CORPORATION**

---

JONES DAY
222 East 41st Street
New York, New York  10017
(212) 326-3939
Richard H. Engman, Esq. (RE - 7861)
Veerle Roovers, Esq. (VR - 5777)
Counsel to the Debtor and
Debtor in Possession

Dated: June 7, 2005

**THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**DISCLOSURE STATEMENT, DATED JUNE 7, 2005**

ALL CREDITORS AND EQUITY INTEREST HOLDERS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE SUMMARIES OF THE PLAN AND THE OTHER STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES OR OTHER APPLICABLE LAWS.  THIS DISCLOSURE STATEMENT HAS NEITHER BEEN APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY REGULATORY AUTHORITY OF ANY STATE, NOR HAS THE SEC OR ANY SUCH AUTHORITY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY ENTITY TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING SECURITIES OF THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSES FOR WHICH IT WAS PREPARED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE.  NO PERSON IS AUTHORIZED BY THE DEBTOR IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS AND SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTOR.  ALTHOUGH THE DEBTOR WILL MAKE AVAILABLE TO ALL PARTIES ENTITLED TO VOTE ON THE PLAN SUCH ADDITIONAL INFORMATION AS MAY BE REQUIRED BY APPLICABLE LAW PRIOR TO THE VOTING DEADLINE, THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF.

EXCEPT AS OTHERWISE INDICATED, THE INFORMATION IN THIS DISCLOSURE STATEMENT REFLECTS THE BUSINESS AND FINANCIAL CONDITION OF THE DEBTOR AS OF MARCH 7, 2005 AND HAS NOT BEEN UPDATED TO REFLECT SUBSEQUENT EVENTS.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY PROCEEDING OTHER THAN THE DEBTOR'S CHAPTER 11 CASE, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS TO ANY PERSON OR ENTITY THAT MAY RESULT FROM CONSUMMATION OF THE PLAN OR THE TRANSACTIONS CONTEMPLATED BY THE PLAN.  AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT AND THE STATEMENTS MADE HEREIN SHALL NEITHER CONSTITUTE NOR BE CONSTRUED AS ANY ADMISSION, STIPULATION, OR WAIVER, BUT RATHER AS STATEMENT OR STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS.

**TABLE OF CONTENTS**

**Page**

INDEX OF DEFINED TERMS ..................................................................................................vi

EXECUTIVE SUMMARY ...................................................................................................1

    A.    Summary of Anticipated Distributions Under the Plan ................................1
    B.    Summary of Post-Confirmation Operations.................................................4

I.    INTRODUCTION.............................................................................................5

    A.    Holders of Claims and Equity Interests Entitled to Vote ..........................5
    B.    Voting Procedures.......................................................................................6
    C.    Confirmation Hearing .................................................................................9

II.    GENERAL INFORMATION REGARDING THE DEBTOR AND ITS REASONS FOR FILING THE CHAPTER 11 CASE ................................................................10

    A.    The Debtor's Business ..............................................................................10
    B.    The Debtor's Outstanding Securities........................................................11
    C.    Prepetition Restructuring Efforts ..............................................................12
    D.    Legal Proceedings ....................................................................................13

III.    THE CHAPTER 11 CASE ...............................................................................14

    A.    Case Administration and Related Activities .............................................15
    B.    Other Restructuring Matters .....................................................................16

IV.    OVERVIEW OF THE PLAN .........................................................................16

    A.    Summary of Classes and Treatment of Claims and Equity Interests ........17
    B.    Provisions Governing Distributions Under the Plan and for Resolving and Treating Contested Claims ...................................................................................................22
    C.    Effect of Confirmation and Effectiveness of the Plan..............................24
    D.    Retention of Jurisdiction by the Bankruptcy Court..................................26

V.    NEW WHX.....................................................................................................28

    A.    Continued Corporate Existence.................................................................28
    B.    Projected Financial Information.................................................................32
    C.    Value of New WHX...................................................................................33
    D.    Summary of Terms of New WHX Common Stock to be Issued on the Effective Date ...........33

VI.    CONFIRMATION AND CONSUMMATION PROCEDURES......................34

    A.    Conditions Precedent to Confirmation of the Plan....................................34
    B.    Conditions Precedent to the Occurrence of the Effective Date.................34
    C.    Requirements of Section 1129(a) of the Bankruptcy Code.......................35
    D.    Best Interests of Creditors.........................................................................36
    E.    Feasibility..................................................................................................37
    F.    Requirements of Section 1129(b) of the Bankruptcy Code ......................38

VII.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......39

    A.    Liquidation Under Chapter 7 ....................................................................39
    B.    Alternative Plan of Reorganization or Liquidation ..................................40

VIII.    RISK FACTORS.............................................................................................40

    A.    Certain Bankruptcy Considerations .........................................................41
    B.    Risks Relating to New WHX's Financial Condition ................................41
    C.    Risks Relating to the Company's Businesses ...........................................43

D.      Factors Affecting the Value of Securities to be Issued Under the Plan ......................................43

IX.     CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN.44

A.      General ...............................................................................................................................44
B.      Federal Income Tax Consequences to the Debtor.............................................................45
C.      Federal Income Tax Consequences to Holders of Claims and Equity Interests ........................48
D.      Certain Other Tax Considerations for Holders of Claims..........................................................49
E.      Importance of Obtaining Professional Tax Assistance ...............................................................50

X.      APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS............................50

A.      General ...............................................................................................................................50
B.      Bankruptcy Code Exemptions from Registration Requirements ................................................51
C.      Certain Transactions by Stockbrokers .......................................................................................53

XI.     RECOMMENDATION AND CONCLUSION ........................................................................54

**TABLE OF EXHIBITS**

Exhibit A     -     Form of Chapter 11 Plan of Reorganization of WHX Corporation

Exhibit B     -     Liquidation Analysis

Exhibit C     -     Subsidiaries of Debtor

Exhibit D     -     Business Plan, Assumptions and Financial Projections

Exhibit E     -     First Quarter of 2005 financial statements

Exhibit F         Fiscal year ending December 31, 2004 financial statements

Exhibit G     -     Fiscal year ending December 31, 2003 Form 10-K

Exhibit H     -     Approval and Procedures Order, entered by the Bankruptcy Court on _____ __, 2005

# INDEX OF DEFINED TERMS

| | |
|---|---|
| 5% Shareholder ..................................................29 | Innisfree ............................................................ 1 |
| 5% Transaction...................................................29 | IRC .................................................................. 22 |
| acceptance ...........................................................6 | Jefferies........................................................... 15 |
| accumulators .....................................................52 | Liquidation Analysis......................................... 40 |
| Ad Hoc Committee .............................................13 | NOLs ............................................................... 16 |
| AICPA................................................................33 | Notice and Balloting Agent .................................. 1 |
| All Holders Rule ................................................13 | Offer................................................................ 13 |
| AMT..................................................................48 | ownership change .............................................. 46 |
| AMTI ................................................................48 | PBGC ............................................................... 14 |
| Annual Limitation ..............................................46 | Plan ................................................................... 1 |
| Approval and Procedures Order............................5 | Preferred Shares................................................ 12 |
| Bankruptcy Code..................................................5 | Projections ....................................................... 32 |
| Bankruptcy Court.................................................1 | Restriction Release Date..................................... 29 |
| Bankruptcy Exception.........................................47 | SEC.................................................................... 2 |
| Bar Date ............................................................16 | street name ......................................................... 8 |
| Bar Date Order ..................................................16 | Sumco .............................................................. 14 |
| Business Continuity Requirement........................47 | Superfund ........................................................ 14 |
| COD ..................................................................45 | Termination Litigation....................................... 14 |
| Company ...........................................................42 | Testing Period................................................... 30 |
| DCA ..................................................................13 | U.S. Trustee ...................................................... 15 |
| Defendants.........................................................15 | Voting Deadline................................................... 7 |
| Disclosure Statement............................................1 | WHX Group ..................................................... 10 |
| distributors .......................................................52 | WHX Pension Plan ............................................ 14 |
| EPA ...................................................................14 | WPC ................................................................ 12 |
| Exchange Act .....................................................13 | WPC Group ...................................................... 12 |
| Fee Claim ..........................................................20 | WPSC ............................................................... 12 |
| H&H..................................................................10 | |

# EXECUTIVE SUMMARY

On March 7, 2005, the Debtor in this chapter 11 case, WHX Corporation, filed a petition for relief under chapter 11 of the Bankruptcy Code together with a chapter 11 plan of reorganization in the bankruptcy court for the Southern District of New York (the "Bankruptcy Court").  On June 7, 2005, the Debtor filed its first amended chapter 11 plan, a copy of which is attached hereto as Exhibit "A" (as may be subsequently amended, the "Plan").  If confirmed by the Bankruptcy Court, the Plan will govern and control the treatment afforded all Claims against and Equity Interests in the Debtor.  This second amended disclosure statement, dated June 7, 2005 (the "Disclosure Statement") describes certain aspects of the Plan, the Debtor's business operations, significant events occurring in its chapter 11 case, and related matters.

This executive summary highlights some of the information discussed in greater detail elsewhere in this Disclosure Statement.  THIS SUMMARY MAY NOT CONTAIN ALL OF THE INFORMATION THAT IS IMPORTANT TO YOU.  FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS THERETO IN THEIR ENTIRETY. All Exhibits to the Plan will be filed with the Bankruptcy Court and available for review, free of charge, on the website of the Debtor (www.whxcorp.com) no later than 10 days before the Voting Deadline.  Copies of all Exhibits to the Plan also may be obtained, free of charge, from Innisfree M&A Incorporated ("Innisfree" or the "Notice and Balloting Agent") by calling (877) 750-2689.

THE PRECEDING PAGE CONTAINS AN INDEX OF TERMS USED AND DEFINED IN THIS DISCLOSURE STATEMENT.  OTHER CAPITALIZED TERMS THAT ARE USED BUT NOT DEFINED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN.

## A.      Summary of Anticipated Distributions Under the Plan

A Claim or Equity Interest is placed in a particular class for the purposes of voting on the Plan and for receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is an Allowed Claim or an Allowed Equity Interest in that class and such Claim or Equity Interest has not been paid, released or otherwise settled prior to the Distribution Date.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims of the kinds specified in sections 507(a)(1) and 507(a)(8) of the Bankruptcy Code, respectively, have not been classified.  Under the Plan, all other Claims against and Equity Interests in the Debtor have been placed into seven (7) classes and will receive the distributions and recoveries (if any) described in the table below.

THE ESTIMATED RECOVERIES ASSUME THAT THE VALUE OF NEW WHX COMMON STOCK TO BE ISSUED UNDER THE PLAN WILL BE ABOUT $105 MILLION.  HOLDERS OF ALLOWED SENIOR NOTES CLAIMS ARE TO RECEIVE 92% OF THE NEW WHX COMMON STOCK (WITH AN ESTIMATED VALUE OF ABOUT $96.6 MILLION) AND HOLDERS OF ALLOWED PREFERRED EQUITY INTERESTS ARE TO RECEIVE (1) 8% OF THE NEW WHX COMMON STOCK (WITH AN ESTIMATED VALUE OF ABOUT $8.4 MILLION), AND (2) WARRANTS FOR AN ADDITIONAL 7% OF NEW WHX COMMON STOCK AT AN EXERCISE PRICE OF $11.20 PER SHARE (WHICH WOULD EQUATE TO A $112 MILLION VALUE FOR THE NEW WHX COMMON STOCK). THERE CAN BE NO ASSURANCE, HOWEVER, THAT SUCH ESTIMATED VALUES AND RECOVERIES RELATING TO THE NEW WHX COMMON STOCK ARE ACCURATE OR RELIABLE.

| Class & Description | Treatment Under the Plan |
|---|---|
| **Class 1 — Priority Non-Tax Claims (if any):**<br><br>Non-Tax Claims, such as employee compensation and benefits that do not exceed $4,925, that are entitled to priority under the Bankruptcy Code.<br><br>**Estimated Aggregate Allowed Amount: $0.00** | **Unimpaired**<br><br>Allowed Priority Non-Tax Claims are unimpaired by the Plan and will be paid in the ordinary course of the Debtor's business.  Holders of Allowed Class 1 Claims will not be entitled to cast a ballot with respect to the Plan and, instead, will conclusively be deemed to have accepted the Plan.<br><br>**Percentage Recovery:  100%** |
| **Class 2 — Secured Claims (if any):**<br><br>All Claims secured by a valid, perfected and enforceable Lien on any Asset of the Debtor.<br><br>**Estimated Aggregate Allowed Amount: $0.00** | **Unimpaired**<br><br>Class 2 Claims are unimpaired by the Plan and will be treated in accordance with section 1124 of the Bankruptcy Code.  Holders of Allowed Class 2 Claims will not be entitled to vote on the Plan, and instead, will be deemed to have accepted the Plan.<br><br>**Percentage Recovery:  100%** |
| **Class 3 — Senior Notes Claims:**<br><br>All Claims arising under or in connection with the Senior Notes Indenture.<br><br>**Aggregate Allowed Amount: $96,664,295** | **Impaired**<br><br>The Plan provides for the distribution of 92% of the equity in the reorganized Debtor to holders of Allowed Senior Notes Claims.  Class 3 Claims are impaired by the Plan and holders of Allowed Class 3 Claims will be entitled to vote to accept or reject the Plan.<br><br>**Estimated Percentage Recovery:  100%** |
| **Class 4 — Other Unsecured Claims:**<br><br>All Claims against the Debtor that are not Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims or Senior Notes Claims.<br><br>**Estimated Aggregate Allowed Amount:**<br>**Less than $10,000** | **Impaired**<br><br>On the Distribution Date, each holder of an Allowed Other Unsecured Claim will receive Cash in an amount equal to the amount of its Allowed Claim (i.e., the amount owed to such creditor as of the Petition Date).  Class 4 Claims are impaired by the Plan and holders of Allowed Class 4 Claims will be entitled to vote to accept or reject the Plan.<br><br>**Estimated Percentage Recovery: 100%** |

| Class & Description | Treatment Under the Plan |
|---|---|
| **Class 5 — Series A Interests:**<br><br>All shares or other instruments evidencing a preferred Series A stock ownership in the Debtor. | **Impaired**<br><br>The Plan provides for the distribution of 8% of the equity in the reorganized Debtor to holders of Allowed Preferred Equity Interests, together with Warrants for an additional 7% of the fully diluted equity equity at an $11.20 per share strike price (Series A Interests to receive approximately 3.66% of the equity and Warrants for an additional 3.2% and Series B Interests to receive approximately 4.34% of the equity and Warrants for an additional 3.8%). Class 5 Series A Interests are impaired by the Plan and holders of Allowed Series A Interests will be entitled to vote to accept or reject the Plan. |
| **Series A Shares Outstanding: 2,573,926** | **Estimated Aggregate Value of Recovery: $3.85 million** |
| **Class 6 — Series B Interests:**<br><br>All shares or other instruments evidencing a preferred Series B stock ownership in the Debtor. | **Impaired**<br><br>The Plan provides for the distribution of 8% of the equity in the reorganized Debtor to holders of Allowed Preferred Equity Interests, together with Warrants for an additional 7% of the fully diluted equity equity at an $11.20 per share strike price (Series A Interests to receive approximately 3.66% of the equity and Warrants for an additional 3.2% and Series B Interests to receive approximately 4.34% of the equity and Warrants for an additional 3.8%). Class 6 Series B Interests are impaired by the Plan and holders of Allowed Series B Interests will be entitled to vote to accept or reject the Plan. |
| **Series B Shares Outstanding: 2,949,000** | **Estimated Aggregate Value of Recovery: $4.55 million** |
| **Class 7 — Common Equity Interests:**<br><br>All shares or other instruments evidencing a common stock ownership interest in the Debtor. | **Impaired**<br><br>On the Effective Date, each and every common Equity Interest in the Debtor will be cancelled and discharged and the holder thereof will receive no distribution under the Plan. Class 7 Common Equity Interests are impaired by the Plan and holders of such common Equity Interests will not be entitled to vote on the Plan and, instead, will be deemed to have rejected the Plan. |
| **Shares Outstanding: 5,485,856** | **Percentage Recovery: 0%** |

After careful review of the Debtor's current business operations, estimated recoveries in a liquidation scenario, and prospects as an ongoing business, the Debtor has concluded that the recovery to creditors and Equity Interest holders will be maximized by the Debtor's continued operation as a going concern. The Debtor believes that its business and Assets have significant value that would not be realized in the liquidation of the Debtor, either in whole or in substantial part. According to the liquidation analysis prepared by the Debtor (attached hereto as Exhibit "B"), the Debtor is worth considerably more to its stakeholders in general as a going concern.

**B.**     **Summary of Post-Confirmation Operations.**

Attached hereto as Exhibit "D" are financial statements that project financial performance for a reorganized WHX, on a consolidated basis with its subsidiaries, through December 31, 2008. These projections are based upon information available as of May 31, 2005 and the current business plan for reorganized WHX and its subsidiaries. For context, a copy of the Debtor's financial statements for the first quarter of 2005 are annexed hereto as Exhibit "E," a copy of Debtor's financial statements for the fiscal year ended December 31, 2004 are annexed hereto as Exhibit "F" and a copy of the Debtor's Form 10-K for the fiscal year ended December 31, 2003 is annexed hereto as Exhibit "G."

# I.

## INTRODUCTION

The Debtor submits this Disclosure Statement, pursuant to section 1125 of title 11 of the United States Code (11 U.S.C. §§ 101 et seq., the "<u>Bankruptcy Code</u>") in connection with the solicitation of acceptances of its Plan. The Debtor is seeking approval of the Plan. Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan.

A BALLOT IS ENCLOSED WITH THIS DISCLOSURE STATEMENT IF YOU ARE A HOLDER OF A CLAIM OR EQUITY INTEREST ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, WHICH ARE CLASS 3 (SENIOR NOTES CLAIMS), CLASS 4 (OTHER UNSECURED CLAIMS), CLASS 5 (SERIES A INTERESTS), AND CLASS 6 (SERIES B INTERESTS).

THE BALLOT CONTAINS PROVISIONS ENABLING EACH HOLDER OF AN ALLOWED CLAIM OR ALLOWED PREFERRED EQUITY INTEREST IN CLASS 3 (SENIOR NOTES CLAIMS), CLASS 4 (OTHER UNSECURED CLAIMS), CLASS 5 (SERIES A INTERESTS) OR CLASS 6 (SERIES B INTERESTS) TO VOTE ON ACCEPTANCE OR REJECTION OF THE PLAN.

HOLDERS OF PRIORITY NON-TAX CLAIMS AND SECURED CLAIMS ARE UNIMPAIRED BY THE PLAN, ARE CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN, ARE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, AND ARE THUS NOT RECEIVING BALLOTS.

HOLDERS OF COMMON EQUITY INTERESTS IN THE DEBTOR ARE RECEIVING NO DISTRIBUTIONS UNDER THE PLAN, ARE DEEMED TO HAVE REJECTED THE PLAN, AND ARE THEREFORE NOT RECEIVING BALLOTS.

On _____, 2005, after notice and a hearing, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's creditors and Equity Interest holders to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The order approving the Disclosure Statement (the "<u>Approval and Procedures Order</u>"), a copy of which is annexed hereto as Exhibit "H," sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each ballot. Each holder of a Claim or Equity Interest entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Approval and Procedures Order and the instructions accompanying the ballot in their entirety before voting on the Plan. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A. Holders of Claims and Equity Interests Entitled to Vote

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Allowed Equity Interests in classes of Claims or Equity Interests that are impaired under the terms and provisions of a chapter 11 plan and that will receive distributions under the chapter 11 plan are entitled to vote to accept or reject the plan. Classes of Claims or Equity Interests in which the holders will not receive or retain any property under a chapter 11 plan are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

Classes of Claims or Equity Interests in which the holders are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.

With respect to the Debtor's Plan, each of Class 1 (Priority Non-Tax Claims) and Class 2 (Secured Claims) are unimpaired by the Plan and the holders of Claims in each of such classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

Class 3 (Senior Notes Claims), Class 4 (Other Unsecured Claims), Class 5 (Series A Interests) and Class 6 (Series B Interests) are entitled to vote to accept or reject the Plan.

Holders of common Equity Interests in Class 7 are not entitled to receive or retain any property under the Plan, they are presumed to have rejected the Plan, and therefore, are not entitled to vote on the Plan.

The Bankruptcy Code defines "acceptance" of a plan (i) by a class of Claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims that cast ballots for acceptance or rejection of the Plan, and (ii) by a class of Equity Interests as acceptance by holders in that class that hold at least two-thirds in amount of Allowed Equity Interests in such class that cast ballots for acceptance or rejection of the Plan. For a complete description of the requirements for confirmation of the Plan, see Article VI, "Confirmation and Consummation Procedures."

UNDER SECTION 1129 OF THE BANKRUPTCY CODE, A PLAN CAN BE CONFIRMED ONLY IF AT LEAST ONE IMPAIRED CLASS ACCEPTS THE PLAN. THEREFORE, IN ADDITION TO THE OTHER REQUIREMENTS FOR CONFIRMATION DESCRIBED BELOW, THE PLAN CAN BE CONFIRMED ONLY IF IT IS ACCEPTED BY AT LEAST ONE OF THE FOLLOWING CLASSES: CLASS 3 (SENIOR NOTES CLAIMS), CLASS 4 (OTHER UNSECURED CLAIMS), CLASS 5 (SERIES A INTERESTS) OR CLASS 6 (SERIES B INTERESTS). IF AT LEAST ONE IMPAIRED CLASS ACCEPTS THE PLAN, BUT ONE OR MORE OTHER CLASSES REJECTS THE PLAN, THE DEBTOR HAS THE RIGHT TO REQUEST CONFIRMATION OF THE PLAN PURSUANT TO SECTION 1129(b) OF THE BANKRUPTCY CODE. SECTION 1129(b) PERMITS THE CONFIRMATION OF A PLAN NOTWITHSTANDING THE NON-ACCEPTANCE OF ONE OR MORE IMPAIRED CLASSES OF CLAIMS OR EQUITY INTERESTS. UNDER THAT SECTION, A PLAN MAY BE CONFIRMED BY A BANKRUPTCY COURT IF IT DOES NOT "DISCRIMINATE UNFAIRLY" AND IS "FAIR AND EQUITABLE" WITH RESPECT TO EACH NON-ACCEPTING CLASS. FOR A MORE DETAILED DESCRIPTION OF THE REQUIREMENTS FOR CONFIRMATION OF A NONCONSENSUAL PLAN, SEE ARTICLE VI, SECTION F, "CONFIRMATION AND CONSUMMATION PROCEDURES -- REQUIREMENTS OF SECTION 1129(b) OF THE BANKRUPTCY CODE."

Class 3, Class 4, Class 5 and Class 6 are the only classes entitled to vote on the Plan and, so long as the Plan is accepted by at least one of such classes entitled to vote, the Debtor will request confirmation of the Plan over the rejection of the Plan by another class, including, but not limited to, the deemed rejection of the Plan by Class 7.

## B. Voting Procedures

If you are entitled to vote to accept or reject the Plan, a ballot is enclosed for the purpose of voting on the Plan. Holders of impaired Claims and Equity Interests voting on the Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check the appropriate box entitled "Accept the Plan" or "Reject the Plan." In order for your vote to be counted, you must complete and sign your original ballot (copies will not be accepted) and return it in the envelope provided.

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact the Notice and Balloting Agent:

Innisfree M&A Incorporated
501 Madison Avenue, 19th Floor
New York, New York 10022
Tel: (877) 750-2689

DO NOT RETURN ANY NOTE, STOCK CERTIFICATE OR OTHER SECURITY INSTRUMENT WITH YOUR BALLOT.

TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED NO LATER THAN 5:00 P.M., EASTERN TIME, ON [JULY 11], 2005 (THE "VOTING DEADLINE").

ANY CLAIM IN AN IMPAIRED CLASS AS TO WHICH AN OBJECTION OR REQUEST FOR ESTIMATION IS PENDING OR WHICH IS SCHEDULED BY THE DEBTOR AS UNLIQUIDATED, DISPUTED OR CONTINGENT IS NOT ENTITLED TO VOTE UNLESS THE HOLDER OF SUCH CLAIM HAS OBTAINED AN ORDER OF THE BANKRUPTCY COURT TEMPORARILY ALLOWING SUCH CLAIM FOR THE PURPOSE OF VOTING ON THE PLAN.

PURSUANT TO THE ORDER APPROVING THE DISCLOSURE STATEMENT, THE BANKRUPTCY COURT SET [JUNE 8,] 2005 AS THE RECORD DATE FOR VOTING ON THE PLAN. ACCORDINGLY, ONLY HOLDERS OF SENIOR NOTES CLAIMS, SERIES A INTERESTS, SERIES B INTERESTS OR OTHER UNSECURED CLAIMS AS OF [JUNE 8,] 2005 THAT ARE OTHERWISE ENTITLED TO VOTE UNDER THE PLAN WILL RECEIVE A BALLOT AND MAY VOTE ON THE PLAN.

ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

1.  **Ballots**

All votes to accept or reject the Plan with respect to any class of Claims or Preferred Equity Interests must be cast by properly submitting the duly completed and executed form of ballot designated for such class.

Ballots cast by the beneficial holders of Claims and Preferred Equity Interests and master ballots completed by brokerage firms or other intermediaries having power of attorney to vote on behalf of beneficial owners (*see* below, Article I Section B.2 "Beneficial Holders of Securities") must be delivered to the Notice and Balloting Agent, at its address set forth above, and received by the Voting Deadline. THE METHOD OF SUCH DELIVERY IS AT THE ELECTION AND RISK OF THE VOTER. If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery.

In accordance with Bankruptcy Rule 3018(c), the ballots are based on Official Form No. 14, but have been modified to meet the particular needs of this Chapter 11 Case. PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT.

Each ballot enclosed with this Disclosure Statement has been encoded with the amount of the Allowed Claim or Allowed Preferred Equity Interest for voting purposes (if the Claim is a Contested Claim, this amount may not be the amount ultimately allowed for purposes of distribution) and the class into which the Claim or Preferred Equity Interest has been placed under the Plan. In voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

## 2. Beneficial Owners of Securities

If you are the beneficial owner of a Senior Note or Preferred Equity Interest and hold such security in your own name, you can vote by completing and signing the enclosed ballot and returning it directly to the Notice and Balloting Agent using the enclosed preaddressed, postage prepaid envelope.

If you hold Senior Notes or Preferred Equity Interests in "street name" (i.e., through a brokerage firm, commercial bank, trust company or other nominee) or an authorized signatory (a brokerage firm or other intermediary having power of attorney to vote on behalf of a beneficial owner), you will receive a ballot from a bank or brokerage firm (or its agent), in which case you must return the ballot to that bank or brokerage firm (or its agent), and you can vote by following the instructions set forth below:

- fill in all the applicable information on the ballot;

- sign the ballot (unless the ballot has already been signed by the bank, trust company or other nominee); and

- return the ballot to the address indicated on the ballot in the preaddressed, postage prepaid envelope enclosed with the ballot. If no envelope was enclosed, contact your brokerage firm, commercial bank, trust company or other nominee or agent thereof for instructions.

IF YOU HOLD YOUR SENIOR NOTES OR PREFERRED EQUITY INTERESTS IN STREET NAME, YOU SHOULD RETURN YOUR BALLOT NO LATER THAN [JULY 11,] 2005 TO PROVIDE SUFFICIENT TIME FOR YOUR BROKERAGE FIRM, COMMERCIAL BANK, TRUST COMPANY OR OTHER NOMINEE, OR THE AGENT THEREOF, TO PROCESS AND TALLY YOUR BALLOT AND DELIVER IT TO THE NOTICE AND BALLOTING AGENT BY THE VOTING DEADLINE.

You may receive multiple mailings of this Disclosure Statement, especially if you own Senior Notes or Preferred Equity Interests through more than one brokerage firm, commercial bank, trust company or other nominee. If you submit more than one ballot for a class because you beneficially own the securities in that class through more than one broker or bank, you must indicate in the appropriate item of the ballot(s) the names of ALL broker dealers or other intermediaries who hold securities for you in the same class.

Authorized signatories voting on behalf of more than one beneficial owner must complete a separate ballot for each such beneficial owner. Any ballot submitted to a brokerage firm or proxy intermediary will not be counted until the brokerage firm or proxy intermediary (a) properly executes the ballot(s) and delivers them to the Notice and Balloting Agent, or (b) properly completes and delivers a corresponding master ballot to the Notice and Balloting Agent.

By voting on the Plan, you are certifying that you are the beneficial owner of the Senior Notes or Preferred Equity Interests being voted or an authorized signatory for the beneficial owner. Your submission of a ballot will also constitute a request that you (or in the case of an authorized signatory, the beneficial owner) be treated as the record holder of those securities for purposes of voting on the Plan.

## 3. Brokerage Firms, Banks and Other Nominees

A brokerage firm, commercial bank, trust company or other nominee that is the registered holder of a Senior Note or a Preferred Equity Interest for a beneficial owner, or that is a participant in a securities clearing agency and is authorized to vote in the name of the securities clearing agency pursuant to an omnibus proxy and is acting for a beneficial owner, can vote on behalf of such beneficial owner by:

- distributing a copy of this Disclosure Statement and all appropriate ballots to the beneficial owner;

- collecting all such ballots;

- completing a master ballot compiling the votes and other information from the ballots collected; and

- transmitting the completed master ballot to the Notice and Balloting Agent.

A proxy intermediary acting on behalf of a brokerage firm or bank may follow the procedures outlined in the preceding sentence to vote on behalf of the beneficial owner. In lieu of collecting ballots from beneficial owners, compiling the votes and other information from those ballots on a master ballot and transmitting the completed master ballot to the Notice and Balloting Agent, a brokerage firm, commercial bank, trust company or other nominee may prevalidate a beneficial owner's ballot and distribute the prevalidated ballot with a copy of this Disclosure Statement to the beneficial owner for voting. In that case, beneficial owners should complete the prevalidated ballot and return it directly to the Notice and Balloting Agent in the enclosed preaddressed, postage prepaid envelope. A brokerage firm, commercial bank, trust company or other nominee prevalidates a beneficial owner's ballot by indicating on the ballot the record holder of the securities to be voted and the appropriate account numbers of the beneficial owner.

### 4. Voting Multiple Claims

Separate forms of ballots are provided for voting the various Claims, and classes of Claims and Preferred Equity Interests. A SEPARATE ballot must be used for each Claim or Preferred Equity Interest. Any Person who holds Claims in more than one class or multiple Claims within a class is required to vote separately with respect to each Claim. Please sign, and return in accordance with the instructions in this section, a separate ballot with respect to each such Claim or Preferred Equity Interest. Only ballots with original signatures will be accepted. Ballots with copied signatures will NOT be accepted.

## C. Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a Confirmation Hearing at which it will hear objections (if any) and consider evidence with respect to whether the Plan should be confirmed. At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.

The Confirmation Hearing has been scheduled to begin on [July 20, 2005, at 10:00 a.m.] (Eastern Time) before the Honorable Allan L. Gropper, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to the confirmation of the Plan must be made in writing and date in detail (1) the name and address of the objector, (2) the amount and nature of the Claim or Equity Interest held by the objector and (3) all grounds for the objection. Any such objection must be filed with the Bankruptcy Court, with a copy to Judge Allan L. Gropper's Chambers, and served so that it is received by the Bankruptcy Court, Judge Allan L. Gropper's Chambers, and the following parties on or before [July 13], 2005 at 4:00 p.m. (Eastern Time): (a) the Debtor, 110 East 59th Street, New York, New York 10022 (Attn: Stewart E. Tabin, Esq.); (b) Jones Day, Attorneys for the Debtor, 222 East 41st Street, New York, New York 10017 (Attn: Richard H. Engman, Esq.); (c) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st floor, New York, New York 10004 (Attn: Greg M. Zipes, Esq.); (d) Sonnenschein Nath & Rosenthal LLP, Attorneys for the Creditors Committee, 1221 Avenue of the Americas, New York New York 10020 (Attn: Peter D. Wolfson, Esq.); and (e) Andrews Kurth LLP, Attorneys for the Preferred Committee, 450 Lexington Avenue, 15th Floor, New York, New York 10017 (Attn: Richard Baumfield, Esq.).

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUMMARIES.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTOR, OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.

CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  ALL HOLDERS OF CLAIMS OR EQUITY INTEREST ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD CAREFULLY READ AND CONSIDER FULLY THIS DISCLOSURE STATEMENT, INCLUDING, BUT NOT LIMITED TO, ARTICLE VIII "RISK FACTORS," BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS AND EQUITY INTEREST HOLDERS. ACCORDINGLY, AFTER CAREFULLY REVIEWING THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS, EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IN CLASS 3 (SENIOR NOTES CLAIMS), CLASS 4 (OTHER UNSECURED CLAIMS), CLASS 5 (SERIES A INTERESTS) AND CLASS 6 (SERIES B INTERESTS), IS URGED BY THE DEBTOR TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M., EASTERN TIME, ON [JULY 11,] 2005.**

## II.

## GENERAL INFORMATION REGARDING THE DEBTOR AND ITS REASONS FOR FILING THE CHAPTER 11 CASE

### A.    The Debtor's Business

The Debtor is a Delaware corporation that maintains principal executive offices at 110 East 59th Street, New York, New York 10022 and that is structured to invest in and manage a diverse group of businesses (collectively, with the Debtor, the "WHX Group").  The Debtor's principal asset is its equity interest in Handy & Harman ("H&H").  As a holding company and the ultimate parent of the direct and indirect subsidiaries listed on Exhibit "C" hereto, the Debtor is the parent company of a group of diversified materials engineering and specialty manufacturing companies.  In its Precious Metals segment, H&H's Electronic Materials Group activities include precision stamping, reel-to-reel electroplating and reel-to-reel molding for electronic and electrical components and the Precious Metals Fabrications Group produces brazing and soldering materials for metal-joining applications. H&H's Engineered Materials segment manufactures specialty fasteners for roofing and construction industries, products for the natural gas, electricity and water distribution industries and electro-galvanized products used in the construction and appliance industries.  In the Wire & Tubing segment, the

Specialty Tubing Group manufactures small diameter stainless, carbon steel and specialty alloy tubing and tubing fabrications principally for the medical, semi-conductor, automotive and appliance markets.

The Debtor has commenced its Chapter 11 Case because it believes that chapter 11 relief is necessary to implement its business strategy to grow its core businesses, improve profit margins, and maximize value for its stakeholders. To date, growth has been achieved through emphasis on world-class customer service, product quality, new product introductions and innovations and by building upon the strengths of the WHX Group's most profitable businesses while constantly assessing exposure to low margin, capital-intensive businesses that can be improved or that should be discontinued. Going forward, in addition to product line and other strategic acquisitions, the Debtor has plans for several significant capital projects that are expected to improve profitability, expand capacity and strengthen customer affiliations.

The Debtor, however, will have little or no ability to execute its strategy and achieve its goals without fundamental changes to its current capital structure, which includes not only $92.8 million in principal amount of issued and outstanding Senior Notes, but also an unduly complex ownership structure, four different types of issued and outstanding public securities, an unmanageable level of funded debt relative to earnings, and over $82.5 million of accrued but unpaid preferred stock dividends.

The Debtor believes that consummation of the transactions contemplated by its chapter 11 Plan will simplify and de-lever the Debtor's capital structure, reduce its overall cost of capital, align its capital structure to match its businesses and provide the basis for more attractive future debt and equity financings. In other words, the Debtor believes that consummation of its Plan will afford the best opportunity to realize the benefits of its business strategy and thereby the best opportunity to both maximize current enterprise value and stakeholder recoveries while ensuring that the Debtor is well-positioned to take advantage of future growth and value opportunities.

FOR ADDITIONAL INFORMATION REGARDING THE DEBTOR'S BUSINESS AND PAST PERFORMANCE, PLEASE SEE THE DEBTOR'S HISTORICAL FINANCIAL INFORMATION ATTACHED HERETO AS EXHIBITS "E," "F" AND "G."

**B.     The Debtor's Outstanding Securities**

**1.     Senior Notes**

On April 7, 1998, the Debtor issued its 10.50% Senior Notes due on April 15, 2005. Interest on the Senior Notes is payable semi-annually on April 15 and October 15 of each year. The Senior Notes are unsecured obligations of the Debtor only and have not been guaranteed by any of its subsidiaries. As of the Petition Date, $96,664,295 was owed by the Debtor on account of the Senior Notes, of which $92,820,000 is principal and $3,844,295 is accrued interest. Section 502(b)(2) of the Bankruptcy Code expressly provides that an unsecured creditor's Allowed Claim cannot include any amount of interest that had not already accrued as of the Petition Date. Further pursuant to Section 1129(b) of the Bankruptcy Code, the condition that a chapter 11 plan be "fair and equitable" to a rejecting class of unsecured claims includes a finding that the holders of such reporting class receive under the plan "property of a value, as of the effective date of the plan, equal to the allowed amount of such claim" (emphasis added).

The Creditors Committee, however, has indicated to the Debtor that it believes the Plan cannot be confirmed over the rejection of Class 3 Senior Notes Claims unless the value of distributions to Class 3 is equal to not just the Allowed amount of the Senior Notes Claims, but rather such Allowed amount plus postpetition interest at the appropriate legal rate pursuant to sections 1129(a)(7)(A)(ii) and 726(a) of the Bankruptcy Code.

To the Debtor's knowledge, there is no reported decision in which a court has ruled in favor or against the position being taken by the Creditors Committee.[1]

**2.** **Preferred Stock**

As of the Petition Date, the Debtor's authorized preferred stock consisted of 10 million shares, $.01 par value per share, of which 2,573,926 shares of series A convertible preferred stock and 2,949,000 shares of series B convertible preferred stock were issued and outstanding as of December 31, 2004 (collectively, the "Preferred Shares").  The Preferred Shares are junior in right to payment of all debt obligations of the Debtor but senior to its common stock with respect to dividend rights and rights upon liquidation, winding up and dissolution.  Dividends of $3.25 per annum per Series A Interest and $3.75 share per annum per Series B Interest are cumulative and, if declared by the board of directors, are payable quarterly in arrears on January 1, April 1, July 1 and October 1 of each year.  In addition to any unpaid cumulative dividends, each Preferred Share is entitled to a liquidation preference of $50.00.  The following table describes the total liquidation preference attributable to the Preferred Shares as of the Petition Date:

|  | Total Preferred | Series A | Series B |
|---|---|---|---|
| Shares Outstanding | 5,522,926 | 2,573,926 | 2,949,000 |
| Annual Dividend | $   19,424,009.50 | $        8,365,259.50 | $   11,058,750.00 |
|  |  |  |  |
| Accrued Dividends | $   82,552,040.38 | $   35,552,352.88 | $   46,999,687.50 |
| $50 per Share Preference | $ 276,146,300.00 | $ 128,696,300.00 | $ 147,450,000.00 |
|  |  |  |  |
| Total Liquidation Preference | $ 358,698,340.38 | $ 164,248,652.88 | $ 194,449,687.50 |

**3.** **Common Stock**

As of the Petition Date, the authorized common stock of WHX consisted of 60 million shares of common stock, $.01 par value per share.  A total of 5,485,856 shares of common stock were issued and outstanding as of December 31, 2004.

**C.** **Prepetition Restructuring Efforts**

**1.** **Wheeling-Pittsburgh Corporation Chapter 11 Proceedings**

The Debtor, until August 2003, owned 100% of the common stock of Wheeling-Pittsburgh Corporation ("WPC" and, with its subsidiaries, the "WPC Group"), which in turn owned 100% of the common stock of a group of carbon steel and steel-related manufacturing operations, including Wheeling-Pittsburgh Steel Corporation ("WPSC").  WPSC's financial position was precarious for several years as a result of, among other reasons, a substantial decline in its profitability brought on by a steep drop in the prices of its finished products.  To address those issues, WPSC filed for relief under chapter 11 of the Bankruptcy Code in November 2000.  Had a shutdown of WPSC's facilities occurred,  WHX's liabilities under the WHX Pension Plan would have increased materially.  The Debtor devoted substantial resources to WPSC to facilitate its reorganization and thereby preserve the value of the remaining assets of the WHX Group.  WPSC successfully reorganized in August 2003, and is now an independent company. As a result of the chapter 11 cases of the WPC Group, the financial health of the WHX Group was adversely affected.  Additional information regarding the WPSC

---

[1] The Creditors Committee also asserts under the same legal rationale that the Plan cannot be confirmed over the rejection of the Plan by holders of Other Unsecured Claims to be treated under Class 4 Other Unsecured Claims unless the holders of such Claims receive the Allowed amount of their Claims plus postpetition interest at the appropriate legal rate.

chapter 11 case is set forth in the Debtor's Form 10-K for the year ended December 31, 2003, attached to this Disclosure Statement as Exhibit "G."

## 2. Discontinued Operations

In line with its business strategy of reducing its exposure to low-margin, capital intensive businesses, and to facilitate its restructuring efforts, in 2004 the WHX Group attempted to find purchasers for the two companies then comprising its Wire and Cable segment, Maryland Specialty Wire and Strandflex. Certain third parties expressed interest in purchasing various assets of the two businesses in this segment, but the WHX Group decided in December 2004 that it would realize greater value from the closure of the two businesses. The WHX Group is in the process of selling off the assets of these businesses.

## 3. Out-of-Court Restructuring Efforts

As described above, the Debtor's efforts to restructure its operations and jettison certain business lines have provided and will continue to provide significant benefits to the Debtor's overall profitability. Nevertheless, the Debtor recognized that operational improvements alone would not enable it to meet the April 15, 2005 maturity of the Senior Notes. As a result, in early 2004, the Debtor and its advisors initiated discussions with potential strategic investors to explore comprehensive restructuring alternatives, including raising additional capital for the WHX Group outside of chapter 11 of the Bankruptcy Code.

In addition to the above described discussions, negotiations, reviews, analyses, and actions, in August 2004 the WHX Group initiated discussions with an informal committee formed by certain holders of Preferred Equity Interests (the "Ad Hoc Committee"). In conjunction with such discussions, the Ad Hoc Committee's legal and financial advisors began an extensive review of the WHX Group, its finances and its operations. The Ad Hoc Committee and its advisors thereafter began participating in negotiations with WHX and others concerning a restructuring of WHX's debt.

Despite these efforts and negotiations, the Debtor ultimately concluded that a transaction outside of chapter 11 would not provide it with similar or greater benefits than those that could be achieved through reorganization under chapter 11. Accordingly, the Debtor and its advisors expanded the options under consideration to include a reorganization pursuant to the chapter 11 Plan described herein.

## D. Legal Proceedings

## 1. SEC Enforcement Action

On June 25, 1998, the SEC instituted an administrative proceeding against the Debtor alleging that it had violated certain SEC rules in connection with the tender offer for Dynamics Corporation of America ("DCA") commenced on March 31, 1997 through the Debtor's wholly-owned subsidiary, SB Acquisition Corporation (the "Offer"). The SEC alleges that, in its initial form, the Offer violated the "All Holders Rule" (the "All Holders Rule"), rule 14d-10(a)(1) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and that the Debtor violated rules 14d-4(c) and 14d-6(d) under the Exchange Act upon expiration of the Offer. The SEC does not claim that the Offer was intended to defraud or in fact defrauded any investor. On October 6, 2000, the initial decision of the administrative law judge who heard the case dismissed all charges against the Debtor, with the finding that the Debtor had not violated the law.

The division of enforcement filed a petition and brief for the SEC to review the decision, but only as to the All Holders Rule claim. On June 4, 2003, the SEC issued an opinion that found that the Debtor had violated the All Holders Rule and ordered that the Debtor cease and desist from further violations of section 14(d)(4) of the Exchange Act or the All Holders Rule. The Debtor filed a petition for review of the SEC's decision with the United States Court of Appeals for the District of Columbia. On April 9, 2004, the court of appeals vacated the SEC's cease and desist order, and the portion of the SEC's opinion that found the order justified, because both were arbitrary and capricious. The court of appeals also expressly explained that the court did not need to reach

(and did not reach) the Debtor's other claims, which, among other things, challenged the merits of the SEC's finding that the Debtor violated the All Holders Rule. The Debtor does not know at this time whether the SEC will seek further appellate review of the court's opinion.

### 2. PBGC Action

On March 6, 2003, the Pension Benefit Guaranty Corporation (the "PBGC") published a notice of determination and on March 7, 2003, the PBGC filed a summons and complaint in the United States District Court for the Southern District of New York seeking the involuntary termination of the defined benefit pension plan maintained and sponsored by the Debtor (the "WHX Pension Plan"). WHX filed an answer on March 27, 2003, contesting the PBGC's action. On July 24, 2003, the Debtor entered into an agreement with the PBGC, WPC, Wheeling-Pittsburgh Steel Corporation, and the United Steelworkers of America, AFL-CIO-CLC in settlement of matters relating to the PBGC v. WHX CORPORATION, Civil Action No. 03-CV-1553 (the "Termination Litigation"). Under this settlement, WHX agreed (1) that the WHX Pension Plan, as it is currently constituted, is a single employer pension plan; (2) to contribute funds to the WHX Pension Plan equal to moneys spent, if any, by WHX or its affiliates to purchase Senior Notes in future open market transactions; and (3) to grant the PBGC a pari passu security interest of up to $50 million in the event WHX obtains any future financing on a secured basis or provides any security or collateral for the Senior Notes. Under the settlement, the PBGC agreed (1) that, after the effective date of the plan of reorganization of the WPC Group, if the PBGC terminates the WHX Pension Plan at least one day prior to a steel facility shutdown, WHX will be released from any additional liability to the PBGC resulting from the shutdown; (b) to withdraw its claims in the WPC bankruptcy proceedings; and (3) to dismiss the Termination Litigation.

### 3. Environmental Litigation

Prior to the consummation of the plan of reorganization of the WPC Group, WHX was the sole stockholder of WPC, the parent company of the WPC Group. The WPC Group has been identified as a potentially responsible party under the Comprehensive Environmental Response, Compensation and Liability Act ("Superfund") or similar state statutes at several waste sites. The WPC Group is subject to joint and several liability imposed by Superfund on potentially responsible parties. The WPC Group entered into a settlement agreement with the United States Environmental Protection Agency (the "EPA") that resolves all of the EPA's prepetition unsecured claims under the Superfund law and releases the WPC Group from any future liability for such claims. The Bankruptcy Court for the Northern District of Ohio approved the settlement agreement by order entered June 13, 2003.

In the event the WPC Group is responsible for any environmental liabilities relating to the period prior to the consummation of the plan or reorganization of the WPC Group and is unable to fund these liabilities, claims may be made against WHX for payment of such liabilities.

### 4. Sumco Litigation

On January 20, 2002, a fire occurred at metal plating facility, located in Indianapolis, Indiana, which was owned and operated by Sumco, Inc. ("Sumco"), a subsidiary of the Debtor. The fire caused substantial damage to the facility and its contents. At the time of the fire, the Debtor had in place layered fire insurance policies which had combined limits of $25,000,000. After reviewing the costs and damages suffered by Sumco as a result of the fire, the first two layers of the insurance policies tendered an aggregate of $10,000,000 and the Defendants (as hereinafter defined) who shared liability on the third layer of coverage tendered an additional $5,000,000 out of a potential $15,000,000 layer. On May 25, 2004, Sumco tendered Sumco's sworn statements in proof of loss and subrogation receipts to the Defendants. In these documents, Sumco asserted that its losses exceeded $25,000,000. However, the Defendants failed to pay Sumco the limits of the third layer of coverage.

Accordingly, on July 7, 2004, Sumco initiated a lawsuit against Lloyd's London, Lexington Insurance Co., First State Insurance Company and Wurttembergische Versicherung A.G. (collectively, the

"Defendants") in the Marion County Superior Court in the state of Indiana. The suit seeks a judgment against the Defendants for their pro-rata shares of the remaining $10,000,000 in coverage, plus pre-judgment and post-judgment interest on those amounts. The Debtor expects to receive a recovery of up to $10,000,000 with respect to this litigation, however, the actual amount and timing of any recovery, if any, cannot be predicted with any certainty.

### 5. Other Litigation

The WHX Group is a party to various litigation matters including general liability claims. These claims are generally covered by insurance and are not expected to have a material adverse effect on the financial condition or results of operations of the WHX Group.

### III.

### THE CHAPTER 11 CASE

On March 7, 2005, the Debtor filed a voluntary chapter 11 petition in the Bankruptcy Court. The Debtor will continue to manage its property as debtor-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code. An immediate effect of the filing of the Chapter 11 Case is the imposition of the automatic stay under section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined the commencement or continuation of: (a) all collection efforts by creditors; (b) enforcement of Liens against any Assets of the Debtor; and (c) litigation against the Debtor. Described below are certain significant events that have occurred in the Chapter 11 Case.

### A. Case Administration and Related Activities

### 1. Professionals Retained by the Debtor

To assist the Debtor in carrying out the Debtor's duties as a debtor-in-possession and to otherwise represent the Debtor in this Chapter 11 Case, the Debtor employed, with authorization from the Bankruptcy Court, Jones Day as its restructuring counsel.

By orders dated March 31, 2005, the Bankruptcy Court approved the Debtor's retention of the following professionals: (a) the law firm of Olshan Grundman Frome Rosenzweig & Wolosky LLP as special corporate counsel; (b) Innisfree M&A Incorporated as Notice and Balloting Agent; (c) PricewaterhouseCoopers LLP as independent auditors and tax advisors; and (d) the law firm of Cronin & Vris LLP as special strategic counsel.

By order dated April 26, 2005, the Bankruptcy Court approved the Debtor's retention of Jefferies & Company, Inc. ("Jefferies") as financial advisors.

### 2. The Committees

On March 16, 2005, the United States Trustee for the Southern District of New York (the "U.S. Trustee") appointed the following members to the Creditors Committee:

| | | |
|---|---|---|
| Steel Partners II, L.P. | Pension Benefit Guaranty | J.P. Morgan Trust Company |
| 590 Madison Avenue | Corporation |   National Association |
| 32nd Floor | 1200 K Street, N.W. | 6525 West Campus Oval |
| New York, New York 10022 | Washington, D.C. 20005-4026 | New Albany, Ohio 43054 |
| Attn.: Jack Howard | Attn.: Garth Wilson | Attn.: Harold L. Kaplan |
|       Josh Schechter | Tel.: (202) 326-4020 x 3878 |       Mark F. Hebbeln |
| Tel.: (212) 758-3232 x 120 | | Tel.: (312) 569-1000 |

On April 20, 2005, the Bankruptcy Court approved the Creditors Committee's retention of Sonnenschein Nath & Rosenthal LLP as its legal counsel. On June 3, 2005, the Bankruptcy Court approved the Creditors Committee's retention of Imperial Capital, LLC as its financial advisor effective as of March 16, 2005.

On April 7, 2005, the U.S. Trustee appointed the following members to Preferred Committee:

Mariner Investment Group
500 Mamaroneck Avenue
Suite 101
Harrison, New York 10528
Attn.: Bradd Gold
Tel.: (914) 798-4204
Fax: (914) 777-3363

Dolphin Limited Partnership - I,
LP
96 Cummings Point Road
Stamford, Connecticut 06902
Attn.: Brian Lombardi
Tel.: (203) 358-8000
Fax: (203) 348-3715

Ramat Securities, Ltd.
23811 Chagrin Boulevard
Beachwood, Ohio 44122
Attn.: David Zlatin
Tel.: (216) 595-0987
Fax: (216) 598-0989

Camden Asset Management, LP
2949 Century Park East,
Suite 330
Los Angeles, California 90067
Attn.: Mark Holliday
      Portfolio Manager
Tel.: (503) 243-5000
Fax: (503) 296-5300

Phillip D. Huber
910 Oakland Avenue
Durham, North Carolina 27705
Tel.: (919) 956-5802

On May 10, 2005, the Bankruptcy Court approved the Preferred Committee's retention of Andrews Kurth LLP as its legal counsel. On June 3, 2005, the Bankruptcy Court approved the Preferred Committee's retention of Chanin Capital L.L.C. as its financial advisor.

### 3. Schedules of Assets and Liabilities and Bar Date Order

On the Petition Date, the Debtor filed its Schedules, identifying the assets and liabilities of its Estate. On March 22, 2005, the Debtor filed its statement of financial affairs.

On March 31, 2005, the Bankruptcy Court entered an order setting a deadline of May 16, 2005, at 5:00 p.m. Eastern Time (the "Bar Date") for the filing of proofs of claim in this Chapter 11 Case (the "Bar Date Order"). In accordance with the terms of the Bar Date Order, on April 7, 2005, the Debtor caused a notice of the Bar Date to be mailed to, among others, all holders of Preferred Equity Interests, all creditors and all other known holders of Claims.

## B. Other Restructuring Matters

### 1. Restrictions in Claims and Equity Securities Trading

The Debtor's net operating losses and related tax attributes (collectively, "NOLs") are property of the Estate and are protected by the automatic stay imposed by section 362 of the Bankruptcy Code. The unrestricted trading of Claims against, and Preferred Equity Interests in, the Debtor could severely limit the Debtor's ability to use its NOLs for United States federal income tax purposes. Accordingly, on March 31, 2005, the Bankruptcy Court approved certain notice and hearing procedures for the trading in Claims and Preferred Equity Interests to preserve the NOLs for the benefit of the Debtor, its Estate and its stakeholders.

# IV.

# OVERVIEW OF THE PLAN

The following summary is a brief overview of certain material provisions of the Plan. It is qualified in its entirety by reference to the provisions of the Plan, which is attached hereto as Exhibit "A," and the Exhibits thereto, as amended from time to time, which are or will be available for inspection on the Debtor's website (www.whxcorp.com).

The determination of the relative distributions to be received under the Plan by the holders of Allowed Claims and Allowed Preferred Equity Interests in certain classes was based upon, among other factors, estimates of the amounts of Allowed Claims and Allowed Preferred Equity Interests in such classes and the relative priorities of such Allowed Claims and Allowed Preferred Equity Interests. The distributions to be received by holders of Allowed Claims or Allowed Preferred Equity Interests in certain classes could differ from these estimates if the estimates, despite the Debtor's best efforts, prove to be inaccurate.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization in certain circumstances even if the plan is not accepted by all impaired classes of Claims and Equity Interests. See Article VI Section F "Confirmation and Consummation Procedures — Requirements of Section 1129(b) of the Bankruptcy Code." The Debtor may request confirmation of the Plan pursuant to the cramdown provisions of the Bankruptcy Code with respect to any impaired class of Claims or Equity Interests that rejects the Plan and reserves the right to amend the Plan, if necessary, in connection therewith. If such request were granted by the Bankruptcy Court, the classes, in certain cases, may receive alternative treatment under the Plan. Although the Debtor believes that the Plan can be confirmed under the cramdown provisions of the Bankruptcy Code, there is no assurance that the requirements of such provisions would be satisfied.

## A.     Summary of Classes and Treatment of Claims and Equity Interests

### 1.     Classified Claims

The Plan's classification of Claims and Equity Interests, the Debtor's estimates regarding the aggregate amount of Claims that will be Allowed in each class, and the estimated amount and nature of distributions to holders of Allowed Claims or Allowed Preferred Equity Interests in each class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.

If the Plan is confirmed by the Bankruptcy Court, each holder of an Allowed Claim or Allowed Equity Interest in a particular class will receive the same treatment as the other holders in the same class of Claims or Equity Interests, whether or not such holder voted to accept the Plan. Such treatment will be in exchange for and in full satisfaction, release and discharge of, such holder's respective Claims against or Equity Interests in the Debtor. Moreover, upon confirmation, the Plan will be binding on all holders of a Claim or Equity Interest regardless of whether such holders voted to accept the Plan.

*The estimated aggregate Claim amounts shown in the table below are based upon the Debtor's preliminary review of its books and records and reflect the Debtor's estimates of the aggregate amounts that will be Allowed after resolution of all disputed Claims. Certain of the disputed Claims may be material, and the total amount of all Claims, including disputed Claims, may be materially in excess of the total amount of Allowed Claims assumed in the development of the Plan.*

*The Debtor's $10.50 per share estimate of the value of New WHX Common Stock has been assumed, based upon the going concern enterprise value of New WHX, as set forth in "Section V.C. "New WHX — Value of New WHX." For a discussion of various other factors that could materially affect the value of New*

*WHX Common Stock distributed on the Effective Date see "Section VIII. Risk Factors." Although the Debtor's management believes that these valuation assumptions are reasonable, there is no assurance that the New WHX Common Stock will have the value assumed herein. See "Section VIII. Risk Factors." New WHX intends to apply to list the New WHX Common Stock on a national exchange as soon as practicable after the Effective Date when New WHX meets the listing requirements. However, there can be no assurance that the New WHX Common Stock will ever be listed on a national exchange. If New WHX is not able to list such securities on a national exchange, New WHX intends to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New WHX Common Stock on the OTC Bulletin Board. Again, however, no assurance can be made that such securities will be quoted on the OTC Bulletin Board or that an active trading market will exist. The common stock of the Debtor currently is quoted on The New York Stock Exchange. The value of the New WHX Common Stock ultimately may be substantially higher or lower than reflected in the valuation assumptions provided in this Disclosure Statement because of a number of other factors, including those discussed in "Section VIII. Risk Factors." The value of equity securities, such as the New WHX Common Stock, issued under a plan of reorganization is subject to numerous unforeseeable circumstances and, therefore, cannot be predicted with certainty.*

| Class & Description | Treatment Under the Plan |
| --- | --- |
| **Class 1 — Priority Non-Tax Claims (if any):**<br><br>Non-Tax Claims, such as employee compensation and benefits that do not exceed $4,925, that are entitled to priority under the Bankruptcy Code.<br><br>**Estimated Aggregate Allowed Amount: $0.00** | **Unimpaired**<br><br>Allowed Priority Non-Tax Claims are unimpaired by the Plan and will be paid in the ordinary course of the Debtor's business. Holders of Allowed Class 1 Claims will not be entitled to cast a ballot with respect to the Plan and, instead, will conclusively be deemed to have accepted the Plan.<br><br>**Percentage Recovery: 100%** |
| **Class 2 — Secured Claims (if any):**<br><br>All Claims secured by a valid, perfected and enforceable Lien on any Asset of the Debtor.<br><br>**Estimated Aggregate Allowed Amount: $0.00** | **Unimpaired**<br><br>Class 2 Claims are unimpaired by the Plan and will be treated in accordance with section 1124 of the Bankruptcy Code. Holders of Allowed Class 2 Claims will not be entitled to vote on the Plan, and instead, will be deemed to have accepted the Plan.<br><br>**Percentage Recovery: 100%** |
| **Class 3 — Senior Notes Claims:**<br><br>All Claims arising under or in connection with the Senior Notes Indenture.<br><br>**Aggregate Allowed Amount: $96,664,295** | **Impaired**<br><br>The Plan provides for the distribution of 92% of the equity in the reorganized Debtor to holders of Allowed Senior Notes Claims. Class 3 Claims are impaired by the Plan and holders of Allowed Class 3 Claims will be entitled to vote to accept or reject the Plan.<br><br>**Estimated Percentage Recovery: 100%** |

| Class & Description | Treatment Under the Plan |
|---|---|
| **Class 4 — Other Unsecured Claims:**<br><br>All Claims against the Debtor that are not Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims or Senior Notes Claims. | **Impaired**<br><br>On the Distribution Date, each holder of an Allowed Other Unsecured Claim will receive Cash in an amount equal to the amount of its Allowed Claim (i.e., the amount owed to such creditor as of the Petition Date) Class 4 Claims are impaired by the Plan and holders of Allowed Class 4 Claims will be entitled to vote to accept or reject the Plan. |
| **Estimated Aggregate Allowed Amount: less than $10,000** | **Percentage Recovery: 100%** |
| **Class 5 — Series A Interests:**<br><br>All shares or other instruments evidencing a preferred Series A stock ownership in the Debtor. | **Impaired**<br><br>The Plan provides for the distribution of 8% of the equity in the reorganized Debtor to holders of Allowed Preferred Equity Interests, together with Warrants for an additional 7% of the fully diluted equity equity at an $11.20 per share strike price (Series A Interests to receive approximately 3.66% of the equity and Warrants for an additional 3.2% and Series B Interests to receive approximately 4.34% of the equity and Warrants for an additional 3.8%). Class 5 Series A Interests are impaired by the Plan and holders of Allowed Series A Interests will be entitled to vote to accept or reject the Plan. |
| **Series A Shares Outstanding: 2,573,926** | **Estimated Aggregate Value of Recovery: $3.85 million** |
| **Class 6 — Series B Interests:**<br><br>All shares or other instruments evidencing a preferred Series B stock ownership in the Debtor. | **Impaired**<br><br>The Plan provides for the distribution of 8% of the equity in the reorganized Debtor to holders of Allowed Preferred Equity Interests, together with Warrants for an additional 7% of the fully diluted equity equity at an $11.20 per share strike price (Series A Interests to receive approximately 3.66% of the equity and Warrants for an additional 3.2% and Series B Interests to receive approximately 4.34% of the equity and Warrants for an additional 3.8%). Class 6 Series B Interests are impaired by the Plan and holders of Allowed Series B Interests will be entitled to vote to accept or reject the Plan. |

| Class & Description | Treatment Under the Plan |
|---|---|
| **Series B Shares Outstanding: 2,949,000** | **Estimated Aggregate Value of Recovery: $4.55 million** |
| **Class 7 — Common Equity Interests:**<br><br>All shares or other instruments evidencing a common stock ownership interest in the Debtor. | **Impaired**<br><br>On the Effective Date, each and every common Equity Interest in the Debtor will be cancelled and discharged and the holder thereof will receive no distribution under the Plan. Class 7 Common Equity Interests are impaired by the Plan and holders of such common Equity Interests will not be entitled to vote on the Plan and, instead, will be deemed to have rejected the Plan. |
| **Shares Outstanding: 5,485,856** | **Percentage Recovery: 0%** |

2.     **Administrative Claims**

An Administrative Claim with respect to which notice has been properly filed pursuant to the Plan will become an Allowed Administrative Claim if no objection is filed within forty-five (45) days after the deadline for filing and serving a notice of such Administrative Claim specified in the Plan. If an objection is filed within such forty-five-day period (or any extension thereof), the Administrative Claim will become an Allowed Administrative Claim only to the extent allowed by Final Order or as agreed to by the Debtor. An Administrative Claim that is a Claim under sections 328, 330, or 503 of the Bankruptcy Code for compensation and reimbursement of expenses incurred in connection with the Chapter 11 Case (a "Fee Claim"), and with respect to which an application or other request for compensation or reimbursement of expenses incurred in connection with the Chapter 11 Case of a Professional Person under sections 328, 330, or 503 of the Bankruptcy Code has been properly filed pursuant to the Plan, will become an Allowed Administrative Claim only to the extent allowed by Final Order. An Administrative Claim as to which no notice need be filed as set forth in the Plan will be an Allowed Administrative Claim on the Effective Date.

The Administrative Claims on the Effective Date are estimated at $6,750,000, substantially all of which is expected to be owed to professionals appointed in the Debtor's Chapter 11 Case. Each holder of an Allowed Administrative Claim will receive (a) an amount equal to such holder's Allowed Claim in one Cash payment on the Distribution Date, or (b) such other treatment as may be agreed upon in writing by such holder and the Debtor; provided, however, that an Administrative Claim representing a liability incurred in the ordinary course of business of the Debtor may be paid, at the Debtor's election, in the ordinary course of business. All Allowed Administrative Claims will be paid by, and will be the sole responsibility of, the Debtor.

3.     **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of such holder's Allowed Priority Tax Claim, (a) the amount of such holder's Allowed Priority Tax Claim, with simple interest per annum at the rate publicly quoted on the Confirmation Date by The Wall Street Journal as the "base rate on corporate loans posted by at least 75% of the nation's 30 largest banks" or such other rate as the Bankruptcy Court may determine at the Confirmation Hearing is appropriate, in equal annual Cash payments, beginning on the Distribution Date and continuing on each anniversary of the Distribution Date, until the sixth anniversary of the date of assessment of such Claim (provided that, New WHX may prepay the balance of any such Allowed Priority Tax Claim at any time without penalty); (b) a lesser amount in one Cash payment as may be agreed upon in writing by such holder and the Debtor; or (c) such other treatment as may be agreed upon in writing by such holder and the Debtor. The Confirmation Order will constitute and provide for an injunction by the

Bankruptcy Court as of the Effective Date against any holder of a Priority Tax Claim from commencing or continuing any action or proceeding against any responsible person or officer or director of the Debtor or New WHX that otherwise would be liable to such holder for payment of a Priority Tax Claim so long as New WHX is not in default of its obligations with respect to such Claim under the Plan.

**4.**      **Treatment of Executory Contracts and Unexpired Leases**

(a)      Assumed and Assigned if Not Rejected

The Plan constitutes a motion pursuant to section 365(a) of the Bankruptcy Code by WHX to assume and assign to New WHX, each and every executory contract and unexpired lease of the Debtor that has not been rejected or that is not being rejected, either pursuant to the Plan or by separate motion. The Confirmation Order will constitute the Bankruptcy Court's approval of such assumptions and assignments pursuant to section 365(a) of the Bankruptcy Code and findings by the Bankruptcy Court that (a) the requirements of section 365(b) of the Bankruptcy Code have been satisfied with respect to each assumed and assigned contract and lease and that (b) each such assumption and assignment is in the best interests of the Debtor and its Estate. The Debtor does not anticipate rejecting any executory contracts identified on Schedule G of the Schedules.

(b)      Rejection of Executory Contracts and Unexpired Leases

Pursuant to section 365(a) of the Bankruptcy Code, the Plan constitutes a motion to reject, upon the occurrence of the Effective Date, each and every executory contract and unexpired lease that is listed in the Plan Schedules as being rejected pursuant to the Plan. The Confirmation Order will constitute the Bankruptcy Court's approval of such rejections pursuant to section 365(a) of the Bankruptcy Code and findings by the Bankruptcy Court that (a) the requirements of section 365(a) of the Bankruptcy Code have been satisfied with respect to each rejected executory contract or lease and that (b) each such rejection is in the best interests of the Debtor and its Estate.

(c)      Claims Arising from Rejection

Each creditor holding a Claim arising from the rejection of an executory contract or unexpired lease must file a Claim with the Bankruptcy Court and serve on the Debtor as follows: (a) in the case of an order approving such rejection is entered prior to the Confirmation Date, such Claim must be filed in accordance with such order but in no case more than thirty (30) days after the Confirmation Date; (b) in the case of an executory contract or unexpired lease that is rejected under the Plan, the Claim must be filed no later than thirty (30) days after the Confirmation Date; or (c) in the case an order approving such rejection is entered after the Confirmation Date, the Claim must be filed in accordance with such order. Any Claim arising from the rejection of an executory contract or unexpired lease for which a proof of claim is not filed and served within such time will be forever barred from assertion and will not be enforceable against the Debtor, its Estate or its Assets. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided in the Plan will be treated as Other Unsecured Claims under the Plan.

(d)      Cure Payments

Any Claim for amounts owed pursuant to section 365(b)(1) of the Bankruptcy Code or as a consequence of the Debtor's assumption or assignment of an executory contract or lease (excluding Claims arising from the assumptions of indemnification obligations pursuant to the Plan) must be timely filed and served as provided in the Plan. Any Claim for amounts owed pursuant to section 365(b)(1) of the Bankruptcy Code as a consequence of the Debtor's assumption or assignment of an executory contract or lease (excluding Claims arising from the assumptions of indemnification obligations pursuant to the Plan) that is not filed and served within such time will be forever barred from assertion and will not be enforceable against New WHX or its assets, nor against the Debtor, its Estate or its Assets. Unless otherwise ordered by the Bankruptcy Court, all such Claims for amounts owed pursuant to section 365(b)(1) of the Bankruptcy Code as a consequence of the Debtor's assumption or

assignment of an executory contract or lease that are timely filed as provided in the Plan will be treated as Administrative Claims.

(e)     Indemnification Obligations

Pursuant to title 8 section 145 of the Delaware General Corporation Law, the Debtor's certificate of incorporation and bylaws provide the Debtor's officers and directors with the right to be indemnified to the fullest extent permitted by law.  In addition, the Debtor has entered into employment agreements that explicitly require the Debtor to indemnify Neale X. Trangucci (Chief Executive Officer), Stewart E. Tabin (President), Neil D. Arnold (Executive Chairman) and Robert K. Hynes (Chief Financial Officer).

Under the Plan, the obligations of the Debtor to indemnify, defend, advance litigation expenses, reimburse or limit the liability of any individual serving on and after the Petition Date as an employee, officer or director of the Debtor by reason of such person's service in such capacity or as may be otherwise provided in the Debtor's constituent documents, in a written agreement with the Debtor, or pursuant to applicable law, each as applicable, will be treated as executory contracts that are being assumed and assigned to New WHX pursuant to the Plan and section 365(a) of the Bankruptcy Code.  Accordingly, such obligations will be unimpaired by the Plan irrespective of whether such indemnification is owed with respect to an act or event occurring before or after the Petition Date.  Although the Debtor will be assuming its indemnification obligations under the Plan, the Debtor is not aware of any actions that have been threatened or are under way that would require the Debtor to indemnify any of its officers or directors.

## 5.     Treatment of WHX Pension Plan and Pension Claims

(a) Upon the Effective Date, New WHX will assume and continue the WHX Pension Plan, satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082 and administer the WHX Pension Plan in accordance with its terms and the provisions of ERISA and the Internal Revenue Code (the "IRC").  Nothing in the Plan will be construed as discharging, releasing or relieving New WHX from any liability imposed under any law or regulatory provision with respect to the WHX Pension Plan. Notwithstanding anything to the contrary contained in the Plan, neither the PBGC nor the administrator of the WHX Pension Plan will be enjoined or otherwise precluded from enforcing such liability with respect to the WHX Pension Plan.

(b) The PBGC has notified the Debtor that it estimates the unfunded benefit liabilities of the WHX Pension Plan on a PBGC termination basis to be $216,200,000.  In the event the WHX Pension Plan were to terminate, the PBGC asserts that WHX and its nondebtor subsidiaries would be jointly and severally liable to the PBGC for (i) the unfunded benefit liabilities, (ii) any unpaid contributions, and (iii) any unpaid PBGC premiums.  However, the PBGC's claims are contingent upon circumstances that, under the Plan, are not intended to occur.  Therefore, if the Plan is confirmed and consummated, the WHX Pension Plan will not be terminated and no amounts are expected to be owed to the PBGC by WHX or any of its nondebtor subsidiaries. Contributions to the WHX Pension Plan pursuant to ERISA funding standards are currently estimated to total approximately $30 million over the next three years.  Further, even if the WHX Pension Plan were terminated, WHX could dispute key PBGC assumptions used in determining the $216,200,000 unfunded benefit liabilities which, if successful, could result in a lower unfunded benefit amount.

## B.     Provisions Governing Distributions Under the Plan and for Resolving and Treating Contested Claims

## 1.     Powers and Duties of the Disbursing Agent

Pursuant to the Plan, the Disbursing Agent will make all distributions under the Plan and will be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make distributions on account of Allowed Claims and Allowed Preferred Equity Interests; (b) make distributions

contemplated by the Plan; (c) comply with the Plan and the Disbursement Agent's obligations thereunder; (d) employ, retain, or replace professionals to represent it with respect to its responsibilities; (e) object to Claims and Equity Interests as specified in the Plan, and prosecute such objections; (f) make periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims and Allowed Preferred Equity Interests (such reports to be made available upon request to the holders of any Contested Claim or Preferred Equity Interest); and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to an order of the Bankruptcy Court or the Plan. In connection with the Plan, the Debtor and the Disbursing Agent will comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all distributions under the Plan will be subject to such withholding and reporting requirements.

2. **No Fractional Shares**

No fractional shares of New WHX Common Stock will be distributed under the Plan. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New WHX Common Stock that is not a whole number, the actual distribution of shares of New WHX Common Stock will be rounded as follows: (a) fractions of one-half (1/2) or greater will be rounded to the next higher whole number; and (b) fractions of less than one-half (1/2) will be rounded to the next lower whole number with no further payment or other distribution therefor. However, no distribution pursuant to the Plan an account of an Allowed Claim or Allowed Preferred Equity Interest will be less than one (1) share of New WHX Common Stock. The total amount of authorized shares of New WHX Common Stock to be distributed to holders of Allowed Claims and Allowed Preferred Equity Interests will be adjusted as necessary to account for the rounding.

3. **Surrender of Notes, Instruments, and Securities**

Subject to the provisions of the Plan and the Confirmation Order, as a condition to receiving distributions provided for by the Plan, each holder of a promissory note or other instrument evidencing a Claim (other than the holder of a Senior Notes Claim) will surrender such promissory note or instrument to the Disbursing Agent within sixty (60) days of the Effective Date. All promissory notes and other instruments surrendered pursuant to the preceding sentence will be marked "Compromised and Settled only as provided in the Plan." Except as set forth above or unless waived by the Disbursing Agent, any Person seeking the benefits of being a holder of an Allowed Claim evidenced by a promissory note or other instrument (other than the holder of a Senior Notes Claim), that fails to surrender such promissory note or other instrument must (a) establish the unavailability of such promissory note or other instrument to the reasonable satisfaction of the Disbursing Agent, and (b) provide an indemnity bond in form and amount acceptable to the Disbursing Agent holding harmless the Debtor and the Disbursing Agent from any damages, liabilities, or costs incurred a result of treating such Person as a holder of an Allowed Claim. Thereafter, such Person will be treated as the holder of an Allowed Claim for all purposes under the Plan. Notwithstanding the foregoing, any holder of a promissory note, share certificate, or other instrument evidencing a Claim (other than the holder of a Senior Notes Claim) that fails within one year of the Effective Date to surrender to the Debtor such note or other instrument or, alternatively, fails to satisfy the requirements of the second sentence of this paragraph will be deemed to have forfeited all rights and Claims against the Debtor and will not be entitled to receive any distribution under the Plan.

4. **Expenses Incurred On or After the Effective Date and Claims of the Disbursing Agent**

The amount of any expenses incurred by the Disbursing Agent on or after the Effective Date and any compensation and expenses (including any post-confirmation fees, costs, or expenses) to be paid to or by the Disbursing Agent will be borne by New WHX. Reasonable professional fees and expenses incurred by the Disbursing Agent after the Effective Date in connection with the effectuation of the Plan will be paid by New WHX in the ordinary course of business.

5.      **Exculpation of the Disbursing Agent**

Except as otherwise provided in the Plan, the Disbursing Agent, in its capacity as such, together with its officers, directors, employees, agents, and representatives (acting in that capacity), is, pursuant to the Plan, exculpated by all holders of Claims, holders of Equity Interests, and parties in interest, from any and all Causes of Action including other assertions of liability (such as breach of fiduciary duty) arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except for Causes of Action solely arising out of the Disbursing Agent's gross negligence or willful misconduct.  No holder of a Claim or an Equity Interest, or representative thereof, will have or pursue any Cause of Action or claim (a) against the Disbursing Agent, in its capacity as such, or its officers, directors, employees, agents, and representatives (acting in that capacity) for making payments in accordance with the Plan, or for liquidating assets to make payments under the Plan, or (b) against any holder of a Claim or an Equity Interest for receiving or retaining payments or transfers of assets as provided for by the Plan.  Nothing contained in the Plan will preclude or impair any holder of an Allowed Claim or Allowed Preferred Equity Interest from bringing an action in the Bankruptcy Court to compel the making of distributions contemplated by the Plan on account of such Claim or Preferred Equity Interest against the Debtor or New WHX.

6.      **No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, no payment or distribution will be made with respect to any Claim or Preferred Equity Interest unless and until it becomes an Allowed Claim or Allowed Preferred Equity Interest.  Any distributions and deliveries to be made under the Plan on account of an Allowed Claim or Allowed Preferred Equity Interest will be made on the Distribution Date with respect to such Allowed Claim or Allowed Preferred Equity Interest, as otherwise provided for in the Plan, or as may be ordered by the Bankruptcy Court and will be made in accordance with the provision of the Plan governing the class of Claims or Equity Interests to which such Allowed Claim or Allowed Preferred Equity Interest belongs.

7.      **Exemption From Transfer Taxes**

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, those contemplated by any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan will not be subject to any stamp, real estate, transfer, mortgage recording, sales, use, or other similar tax.

8.      **Objection Deadline**

As soon as practicable, but in no event later than sixty (60) days after the Effective Date (subject to being extended by the Bankruptcy Court upon motion of the Debtor with notice and a hearing), objections to Claims or Preferred Equity Interests will be filed with the Bankruptcy Court and served upon the holders of each of the Claims or Preferred Equity Interests to which objections are made; provided, that no objection may be filed with respect to any Claim or Preferred Equity Interest that is Allowed on or before the Effective Date.

9.      **Prosecution of Objections**

Upon occurrence of the Effective Date, only the Disbursing Agent will have authority to file, litigate, settle, or withdraw objections to Claims and Preferred Equity Interests.

10. **Estimation of Claims**

The Disbursing Agent may, at any time and from time to time, request that the Bankruptcy Court estimate any Contested Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Disbursing Agent, or a Committee (as applicable) previously objected to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## C. Effect of Confirmation and Effectiveness of the Plan

### 1. **Debtor's Authority**

Until the Effective Date, the Bankruptcy Court will retain custody and jurisdiction of the Debtor and its Assets and operations. On and after the Effective Date, the Debtor and its Assets and operations will be released from the custody and jurisdiction of the Bankruptcy Court, except for those matters as to which the Bankruptcy Court specifically retains jurisdiction under the Plan or the Confirmation Order; *provided*, *however*, that the Cash and New WHX Common Stock to be distributed pursuant to the Plan will remain subject to the jurisdiction and custody of the Bankruptcy Court until they are distributed or become unclaimed property as provided in the Plan.

### 2. **Vesting of Assets**

On the Effective Date, title to all Assets of the Debtor will vest in New WHX free and clear of all Liens, Causes of Action, Claims, encumbrances, Equity Interests, and interests against, in, or on such Assets except as may be provided in the Plan.

### 3. **Discharge of the Debtor**

Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Equity Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Causes of Action of any nature whatsoever and all Claims (including any interest accrued thereon since the Petition Date), and termination of any Equity Interests, against the Debtor, its Estate or any of its Assets or properties. Except as otherwise expressly provided in the Plan, upon the Effective Date and immediately after cancellation of the Equity Interests of WHX, the Debtor will be deemed discharged and released to the extent permitted by section 1141 of the Bankruptcy Code from any and all such Causes of Action, and Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts, Claims and Causes of Action of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan; and all Equity Interests and other rights of holders of Equity Interests in the Debtor will be terminated. In accordance with the foregoing, except as provided in the Plan, the Confirmation Order will be a judicial determination, as of the Effective Date and immediately after the cancellation of the Equity Interests of WHX, but prior to the issuance of the New WHX Common Stock, of a discharge of all Causes of Action, Claims and other debts and liabilities against the Debtor and a termination of all Equity Interests and other rights of the holders of Equity Interests in the Debtor, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Cause of Action or Claim or terminated Equity Interest; *provided*, *however*, that, notwithstanding the extinguishment of any such judgment, the existence of a validly entered judgment may be treated as evidence of the entitlement

to a Claim in the Chapter 11 Case, which Claim, subject to other applicable requirements, will be satisfied by the distribution, if any, provided under the Plan.

## 4. Injunction

On the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, all Entities who have been, are, or may be holders of Claims against or Equity Interests in the Debtor will be enjoined from taking any of the following actions against or affecting the Debtor, its Estate, its Indemnitees (which include the Debtor's directors and senior executives), its Assets and property, any direct or indirect successor in interest to the Debtor (including New WHX), or any assets or property of such transferee or successor:

(a) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind that was or could have been pending as of the Effective Date;

(b) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means whether directly or indirectly any judgment, award, decree or order;

(c) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any Lien;

(d) except as provided in the Plan, asserting directly or indirectly any setoff, right of subrogation, or recoupment of any kind; and

(e) proceeding in any manner in any place whatsoever that does not conform to or comply with the provisions of the Plan or the settlements set forth in the Plan to the extent such settlements have been approved by the Bankruptcy Court in connection with confirmation of the Plan.

## 5. Exculpation

From and after the Effective Date, neither the Debtor, its Affiliates, any Committee, nor any of their respective directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity), will have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Debtor's restructuring, including the formulation, preparation, dissemination, implementation, confirmation, or approval of the Plan, the Plan Documents, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for, or contemplated in connection with, the consummation of the transactions set forth in the Plan; *provided*, *however*, that the foregoing provisions will not affect the liability of any Person that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct. Any of the foregoing parties in all respects will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.

## 6. Limited Release of Directors, Officers, and Employees

As of the Effective Date, the Debtor will be deemed to have waived and released its present and former directors, officers, employees, members, attorneys, consultants, advisors, and agents (acting in such capacity) who were directors, officers, employees, members, attorneys, consultants, advisors, or agents, respectively, at any time during the Chapter 11 Case from any and all Causes of Action of the Debtor, including without limitation, Causes of Action which the Debtor as the debtor in possession otherwise has legal power to assert, compromise, or settle in connection with the Chapter 11 Case, arising on or prior to the Effective Date; provided, however, that the foregoing provisions will not operate as a waiver or release of (a) contractual obligations owed by such person to the Debtor, or (b) Causes of Action relating to such person's actions or omissions determined in a Final Order to have constituted gross negligence or willful misconduct.

In addition, notwithstanding anything in the Plan, the Debtor's reorganization proceedings and the Plan will not discharge, release, or relieve any person from any fiduciary liability under ERISA with respect to the WHX Pension Plan. Notwithstanding anything to the contrary contained herein, neither the PBGC nor the administrator of the WHX Pension Plan will be enjoined or otherwise precluded from enforcing such liability with respect to the WHX Pension Plan.

### 7. Transactions on the Effective Date

On the Effective Date, unless otherwise provided by the Confirmation Order, the following will occur, will be deemed to have occurred simultaneously and will constitute substantial consummation of the Plan:

(a)     WHX will cease to exist as the Debtor;

(b)     the New Charter and New Bylaws will be authorized, approved and effective in all respects without further action under applicable law, regulation, order, or rule, including, without express or implied limitation, any action by the stockholders or directors of the Debtor or New WHX; except that the New Charter will be filed with the Secretary of State of the State of Delaware on the Effective Date or as soon thereafter as practicable;

(c)     the Debtor's property deemed transferred to New WHX will automatically vest in New WHX without further action on the part of the Debtor or any other Person;

(d)     the New WHX Common Stock will be authorized for issuance as provided in the Plan; and

(e)     all payments, deliveries, and other distributions to be made pursuant to the Plan on or as soon as practicable after the Effective Date will be made or duly provided for.

### 8. Dissolution of the Committees

On the Effective Date, the Committees will be dissolved and its members will be released of all of their duties, responsibilities, and obligations in connection with the Chapter 11 Case.

### 9. Cancellation of Instruments and Agreements

Upon the occurrence of the Effective Date, except as otherwise provided in the Plan or in the Confirmation Order, all agreements, instruments, indentures, notes, warrants, options, share certificates, or other documents (other than any insurance policy of the Debtor) evidencing, giving rise to, or governing any Claim or Equity Interest will be deemed cancelled and annulled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtor under such agreements, instruments, indentures, notes, warrants, options, share certificates, or other documents will be discharged; *provided*, *however*, that the Senior Notes Indenture will continue in effect solely for the purposes of (a) allowing the holders of the Senior Notes Claims to receive their distributions under the Plan; (b) allowing the Indenture Trustee to make the distributions to be made on account of the Senior Notes; and (c) permitting the Indenture Trustee to recover the Indenture Trustee Fees in accordance with the Plan.

## D. Retention of Jurisdiction by the Bankruptcy Court

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Case after the Effective Date so long as is legally permissible, including, but not limited to, jurisdiction to:

1.     allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured, unsecured or subordinated status of any Claim or Equity Interest, including the resolution of any

request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

2. grant or deny any applications for allowance and payment of any Fee Claim for periods ending on or before the Effective Date;

3. resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4. ensure that distributions to holders of Allowed Claims and Allowed Preferred Equity Interests are accomplished pursuant to the provisions of the Plan, including ruling on any motion or other pleading filed pursuant to the Plan;

5. decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtor or the Disbursing Agent that may be pending on or commenced after the Effective Date;

6. enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement, or to correct any defect, cure any omission, or reconcile any inconsistency therein;

7. resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection therewith, or any other agreements governing, instruments evidencing, or documents relating to the Plan, including the interpretation or enforcement of any rights, remedies, or obligations under the Plan;

8. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan, except as otherwise provided in the Plan;

9. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

10. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or this Disclosure Statement; and

11. enter a Final Decree as contemplated by Bankruptcy Rule 3022.

## V.

## NEW WHX

### A. Continued Corporate Existence

On the Effective Date: (1) New WHX will be incorporated and will exist thereafter as a separate corporate entity, with all corporate powers in accordance with the laws of the State of Delaware, the New Charter and the New Bylaws; and (2) WHX will cease to exist as the Debtor.

1. **New WHX Charter and Bylaws**

The Debtor has sought comments and suggestions from each of the Committees regarding the proposed New Charter and New Bylaws, each of which are Plan Documents that will be filed with the Court at least 10 days before the Voting Deadline.  The Committees have each reserved their rights with respect to any objections to the terms of the proposed New Charter and New Bylaws, including any conditions for meetings of stockholders, and other corporate governance documents regarding New WHX.

(a)     Common Stock

Pursuant to the New Charter, New WHX will have authorized 40 million of New WHX Common Stock of which 10 million shares will be issued under the Plan and outstanding after the Effective Date.  The New Charter will contain a provision restricting certain transfers of New WHX Common Stock.  See Article V Section A.1(e) "Restrictions on Transfer of New WHX Common Stock" for a description of the transfer restrictions to be contained in the New Charter.

(b)     Preferred  Stock

Pursuant to the New Charter, New WHX will have authorized 5 million of New WHX preferred stock of which no shares will be issued under the Plan.

(c)     Voting Rights

The holders of New WHX Common Stock will exclusively possess all voting power with each share of New WHX Common Stock having one vote.

(d)     Special Meeting of Stockholders

A special meeting of stockholders may be called at any time by the chairman of the board of directors, the chief executive officer, the president, by the board of directors pursuant to a resolution adopted by a majority of the total number of directors which New WHX would have if there were no vacancies or by the secretary at the direction of a majority of the voting power of all the then outstanding shares of the voting stock, voting together as a single class upon receipt of a written request to do so specifying the matter or matters, appropriate for action at such a meeting.

(e)     Restrictions on Transfer of New WHX Common Stock

In order to reduce the risk that any change in the ownership of New WHX would jeopardize the preservation of federal income tax attributes of New WHX, including net operating loss carryovers, for purposes of sections 382 and 383 of the IRC, the New Charter will prohibit certain transfers of equity securities of New WHX, including New WHX Common Stock, until the earliest of (a) the 10th anniversary of the Effective Date, (b) the repeal, amendment or modification of section 382 of the IRC in such a way as to render the restrictions imposed by such section no longer applicable to New WHX, (c) the beginning of a taxable year of New WHX in which no income tax benefits from New WHX's tax attributes are available, (d) the determination by New WHX's board of directors that the restrictions will no longer apply, (e) a determination by New WHX's board of directors or the IRS that New WHX is ineligible to use section 382(l)(5) of the IRC permitting full use of the income tax benefits existing as of the Effective Date, and (f) an election by New WHX for section 382(l)(5) of the IRC not to apply (the "<u>Restriction Release Date</u>").  See Article IX Section B.2. "Certain Federal Income Tax Consequences of Consummation of the Plan — Limitation on NOL Carryforwards" for a description of the tax attributes.  Generally, the New Charter will prohibit a transfer of equity securities of New WHX if either (a) the transferor holds 5% or more of the total fair market value of all issued and outstanding equity securities (such person, a "<u>5% Shareholder</u>") or (b) as a result of such transfer, either (i) any person or group of persons would become a 5% Shareholder or (ii) the percentage stock ownership in New WHX of any 5% Shareholder would be increased (any such transfer, a "<u>5% Transaction</u>").

The restrictions on transfer will not apply if:

- the transferor or transferee obtains the prior approval of New WHX's board of directors,

- in the case of a 5% Transaction by any holder of equity securities, prior to such transaction, New WHX's board of directors determines, upon request of the transferor or transferee, that such transfer is a 5% Transaction which, together with any 5% Transactions consummated during the period ending on the date of consummation of such 5% Transaction and beginning on the later of (i) the date three years prior thereto and (ii) the first day after the Effective Date (the "Testing Period"), represent aggregate 5% Transactions involving transfers of less than 40% of the equity securities of New WHX issued and outstanding at the time of transfer.

Any such approval or determination by New WHX's board of directors will require the affirmative vote of a majority of the directors (assuming no vacancies).

Any attempted transfer of equity securities of New WHX that are subject to these restrictions on transfer will be null and void. The purported transferor will remain the owner of such transferred securities and the purported transferee will be required to turn over the transferred securities, or the proceeds from the disposition of and any distributions on the transferred securities, to an agent who is authorized to sell such securities, if it can do so, in arm's-length transactions that do not violate such restrictions. The proceeds of any such sale will be applied to reimburse the agent for its expenses, then any remaining amounts will be paid to reimburse the purported transferee for any payments made by the purported transferee to the purported transferor, and the remainder, if any, will be paid to the purported transferor.

## 2. Governance

Upon the occurrence of the Effective Date and except as expressly provided in the Plan, the management, control and operation of New WHX will become the general responsibility of the board of directors of New WHX, as constituted in the Plan and pursuant to the New Charter and the New Bylaws. On the Effective Date, New WHX's executive officers and its initial board of directors will be composed of the same individuals listed in the chart below that served as the Debtor's executive officers and directors immediately prior to the Effective Date. Immediately following the occurrence of the Effective Date, the terms and manner of selection of executive officers and directors of New WHX will be as provided in the New Bylaws and the New Charter.

## 3. Executive Officers and Directors

The following table provides information regarding the Debtor's existing executive officers and directors (the Debtor expects to identify the members of New WHX's initial board in conjunction with the filing of the New Charter, New Bylaws, and other Plan Documents).

| Name | Position | Age |
|---|---|---|
| Neil D. Arnold | Director and Executive Chairman of the Board | 56 |
| Robert A. Davidow | Director | 62 |
| William Goldsmith | Director | 85 |
| Louis Klein Jr. | Director | 68 |
| Howard Mileaf | Director | 67 |
| Marvin L. Olshan | Director | 76 |
| Garen W. Smith | Director | 61 |
| Stewart E. Tabin | Director and President | 48 |
| Neale X. Trangucci | Director and Chief Executive Officer | 48 |
| Raymond S. Troubh | Director | 77 |
| Robert K. Hynes | Chief Financial Officer | 50 |

| Name | Position | Age |
|------|----------|-----|
| Daniel P. Murphy | President, H&H | 43 |

*Neil D. Arnold* has served as a director on WHX's board of directors since 1992 and as Executive Chairman of the board since February 2004.  He was an officer of WPN Corp., a financial consulting company, from August 2001 until January 2004.  Mr. Arnold was also a private investor from May 1999 until August 2001.  He was Group Finance director of Lucas Varity plc from December 1996 to May 1999.

*Robert A. Davidow* has served as a director on WHX's board of directors since 1992.  He was been a private investor since January 1990.  Mr. Davidow is also a director of Arden Group, Inc., a supermarket holding company.

*William Goldsmith* has served as a director on WHX's board of directors since 1987.  Mr. Goldsmith has served as a management and marketing consultant since 1984.  He has been Chairman of Nucon Energy Corp. since 1997 and of TMP, Inc. from January 1991 to 1993.  Mr. Goldsmith was Chairman and Chief Executive Officer of Overspin Golf Corp. from 1993 to 1997.  He was also Chairman and Chief Executive Officer of Fiber Fuel International, Inc., from 1994 to 1997.  Mr. Goldsmith has been a Life Trustee to Carnegie Mellon University since 1980.  He has been a director of Skidaway Health and Living Services Inc. since 2002.

*Louis Klein Jr.* has served as a director on WHX's board of directors since 2002.  He has been a trustee of Manville Personal Injury Settlement Trust since 1991.  Mr. Klein has also been a trustee of WT Mutual Fund and WT Investment Trust I (Wilmington Trust) since 1998.

*Howard Mileaf* has served as a director on WHX's board of directors since 2002 and as a consultant since 2001.  He was Vice President and General Counsel of WHX from 1993 to 2001.  Mr. Mileaf is also a director of WebFinancial Corporation and Neuberger Berman Mutual Funds.

*Marvin L. Olshan* has served as a director on WHX's board of directors since 1991.  He is a retired partner of Olshan Grundman Frome Rosenzweig & Wolosky LLP who retains the title of Counsel.  Olshan Grundman Frome Rosenzweig & Wolosky LLP is applying with the Court to be retained as special corporate counsel of the Debtor.

*Garen W. Smith* has served as a director on WHX's board of directors since 2002.  He has been Chairman of the Board of H&H since 2003.  Mr. Smith has been Vice President, Secretary and Treasurer of Abundance Corp., a consulting company that provides services to WHX, since 2002.  He was President and Chief Executive Officer of Unimast Incorporated from 1991 to 2002.

*Stewart E. Tabin* has served as a director on WHX's board of directors since 2004 and as President since February 2004.  He has been a general partner of Stonehill Partners, L.P. for in excess of the past five years.  Mr. Tabin was also Vice-President of WPN Corp. from February 1990 through January 2004.

*Neale X. Trangucci* has served as a director on WHX's board of directors since 2004 and as Chief Executive Officer since February 2004.  He has been a general partner of Stonehill Partners, L.P. for in excess of the past five years.  Mr. Trangucci was also Vice-President of WPN Corp. from February 1990 through January 2004.

*Raymond S. Troubh* has served as a director on WHX's board of directors since 1992.  He has been a financial consultant for more than five years.  Mr. Troubh is also a director of Diamond Offshore Drilling, Inc., General American Investors Company, Gentiva Health Services, Inc. and Triarc Companies, Inc., a holding company, and Portland General Electric Company.  Mr. Troubh is a trustee of the Petrie Stores Liquidating Trust.

*Robert K. Hynes* has served as a Chief Financial Officer of WHX since January 2003. Mr. Hynes has been the Vice President of H&H since March 2000. He also served as Vice President of Finance of WHX from June 2001 through January 2003. He was a director of Audit and Financial Standards of H&H from April 1995 through March 2000.

 *Daniel P. Murphy* has served as President of H&H since February 2003. He was Vice President of H&H Engineered Materials Group from January 2002 through February 2003. Mr. Murphy was President of Olympic Manufacturing Group, Inc. from February 1994 through December 2001.

### 4. __Employment Agreements__

Mr. Neil Arnold became the Debtor's Executive Chairman pursuant to a two-year employment agreement dated February 1, 2004, which agreement was amended and restated on March 4, 2005, and which will be automatically extended for successive two-year periods unless earlier terminated pursuant to the provisions of such agreement. The agreement provides for an annual salary of no less than $450,000, an annual bonus to be awarded as may be determined by and in the sole discretion of the WHX board of directors and, pursuant to the March 4, 2005 amendment, the payment of a $250,000 bonus upon entry of an order confirming a chapter 11 plan filed by the Debtor. Mr. Arnold will not receive a distribution of New WHX Common Stock under the Plan. In the event that either (i) the agreement is terminated by WHX other than with cause, or (ii) he elects termination following a material diminution in his position or a change in control of WHX, Mr. Arnold will receive a payment of twice the base salary in effect at the time of termination.

Mr. Robert K. Hynes became Vice President-Finance of WHX pursuant to a one-year employment agreement dated July 1, 2001, which agreement was amended and restated on March 4, 2005, and which has been and will continue to be automatically extended for successive one-year periods unless earlier terminated pursuant to the provisions of such agreement. Mr. Hynes was promoted to Chief Financial Officer in January 2003. The agreement provides for an annual salary to Mr. Hynes of no less than $200,000, an annual bonus to be awarded as may be determined by and in the sole discretion of the WHX board of directors. Mr. Hynes was granted bonuses of $75,000 in each of 2004 and 2003 for services performed in the prior year. Mr. Hynes will not receive a distribution of New WHX Common Stock under the Plan. In the event that his employment is terminated by WHX other than with cause, Mr. Hynes will receive a payment of one year's base salary at the highest rate in effect for the twelve preceding months plus bonus plan and compensation accrued.

Mr. Stewart E. Tabin became President of WHX pursuant to a two-year employment agreement dated February 1, 2004, which agreement was amended and restated on March 4, 2005, which will be automatically extended for successive two-year periods unless earlier terminated pursuant to the provisions of such agreement. The agreement provides for an annual salary of no less than $500,000, an annual bonus to be awarded as may be determined by and in the sole discretion of the WHX board of directors and, pursuant to the March 4, 2005 amendment, the payment of a $250,000 bonus upon entry of an order confirming a chapter 11 plan filed by the Debtor. Mr. Tabin will not receive a distribution of New WHX Common Stock under the Plan. In the event that either (i) the agreement is terminated by WHX other than with cause, or (ii) he elects termination following a material diminution in his position or a change in control of WHX, Mr. Tabin will receive a payment of twice the base salary in effect at the time of termination.

Mr. Neale X. Trangucci became Chief Executive Officer of WHX pursuant to a two-year employment agreement dated February 1, 2004, which agreement was amended and restated on March 4, 2005, which will be automatically extended for successive two-year periods unless earlier terminated pursuant to the provisions of such agreement. The agreement provides for an annual salary of no less than $550,000, an annual bonus to be awarded as may be determined by and in the sole discretion of the WHX board of directors and, pursuant to the March 4, 2005 amendment, the payment of a $250,000 bonus upon entry of an order confirming a chapter 11 plan filed by the Debtor. Mr. Trangucci will not receive a distribution of New WHX Common Stock under the Plan. In the event that either (i) the agreement is terminated by WHX other than with cause, or (ii) he elects

termination following a material diminution in his position or a change in control of WHX, Mr. Trangucci will receive a payment of twice the base salary in effect at the time of termination.

## B.    Projected Financial Information

The Debtor has prepared consolidated projected operating and financial results (the "Projections") for the years ending December 31, 2008, which are attached to this Disclosure Statement as Exhibit "D."  The Projections include (1) a pro-forma reorganized balance sheet at July 31, 2005, including estimated reorganization and fresh-start adjustments; (2) projected balance sheets for the fiscal years ended December 31, 2005, 2006, 2007, and 2008; (3) projected income statements for the fiscal years ended December 31, 2005, 2006, 2007, and 2008; and (4) projected statements of cash flows for the fiscal years ended December 31, 2005, 2006, 2007, and 2008.

THE PROJECTIONS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT "D" WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS ("AICPA"). THE DEBTOR'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTOR DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.  THE DEBTOR AND NEW WHX DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THESE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE OF THIS DISCLOSURE STATEMENT OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE DEBTOR BELIEVES THAT THE PROJECTIONS ARE BASED ON ESTIMATES AND ASSUMPTIONS THAT ARE REASONABLE.  THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTOR'S CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS WILL BE WITHIN THE RANGE SET FORTH IN ITS PROJECTIONS.  SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  SEE "SECTION VIII.  RISK FACTORS."

## C.    Value of New WHX

In conjunction with formulating the Plan, the Debtor determined that it was necessary to estimate the post-confirmation going concern enterprise value for New WHX.  Accordingly, the Debtor, with Jefferies' assistance, prepared such a valuation.

Three methodologies were used to derive the reorganization value of New WHX based on the Projections:  (1) a comparison of WHX and its projected performance to how the market values comparable companies, (2) a comparison of WHX and its projected performance to values of comparable companies in precedent transactions, and (3) a calculation of the present value of the free cash flows under the Projections, including an assumption for a terminal value at the end of the Projection period.

The market-based approaches involve identifying (a) a group of publicly traded companies whose businesses or product lines are comparable to those of WHX as a whole or to significant portions of WHX's operations, and (b) comparable precedent transactions, and then calculating ratios of various financial results or statistics to the market values of these companies or transactions. The ranges of ratios derived are then applied to WHX's historical and projected financial results or statistics to derive a range of implied values. The discounted cash flow approach involves deriving the unlevered free cash flows that WHX would generate assuming the projections were realized. These cash flows and various estimated values of WHX at the end of the projected period are discounted to the present at WHX's estimated post-restructuring weighted average cost of capital to determine the enterprise value of WHX.

ESTIMATES OF VALUE DO NOT PURPORT TO BE APPRAISALS NOR DO THEY NECESSARILY REFLECT THE VALUE THAT MAY BE REALIZED IF ASSETS ARE SOLD. THE ESTIMATES OF VALUE REPRESENT HYPOTHETICAL REORGANIZED ENTERPRISE VALUES ASSUMING THE IMPLEMENTATION OF THE BUSINESS PLAN AS WELL AS OTHER SIGNIFICANT ASSUMPTIONS. SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF FORMULATING AND NEGOTIATING A PLAN OF REORGANIZATION AND ANALYZING THE PROJECTED RECOVERIES THEREUNDER.

Based upon the methods described above, the enterprise value for New WHX at the Effective Date is estimated to be between $210 million and $240 million. On the Effective Date, New WHX's funded indebtedness is expected to be about $120 million. After deducting this amount from the estimated enterprise value, the total equity value of New WHX is likely to be between $90 million and $120 million, with $105 million used as the Debtor's estimate of the total equity value at the Effective Date.

THE ESTIMATED ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS SET FORTH IN THE PROJECTIONS AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED.

THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE EQUITY VALUE ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE. SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THE VALUATION ANALYSIS.

**D.      Summary of Terms of New WHX Common Stock to be Issued on the Effective Date**

The capital stock of New WHX will consist of 40 million authorized shares of New WHX Common Stock, par value $0.01 per share, of which 10 million shares will be issued and outstanding on the Effective Date as follows: (a) 9,200,000 shares to holders of Allowed Claims in Class 3 (Senior Notes Claims); (b) 366,322 shares to holders of Allowed Equity Interests in Class 5 (Series A Interests); and (c) 433,678 shares to holders of Allowed Equity Interests in Class 6 (Series B Interests). See "Section 4.A. Overview of the Plan—Summary of Classes and Treatment of Claims and Equity Interests." After the Effective Date, New WHX may issue additional shares of New WHX Common Stock under the provisions of the New Charter, the New Bylaws, and applicable law. The holders of New WHX Common Stock will be entitled to one vote per each share held of record on all matters submitted to a vote of shareholders.

The New Charter will contain certain provisions restricting the ability of the holders of certain securities of New WHX from transferring such securities. See Article V Section A.1(e) "Restrictions on Transfer of New WHX Common Stock" for a description of such transfer restrictions. In general, these restrictions have the effect of preventing an individual or group from obtaining an equity interest in New WHX sufficient to give such individual or group a controlling interest in New WHX without the consent of New WHX's board of directors.

# VI.

## CONFIRMATION AND CONSUMMATION PROCEDURES

As described more fully below, in addition to the explicit conditions precedent to confirmation and effectiveness that are contained in the Plan, the Bankruptcy Court will confirm the Plan only if it (1) is accepted by all impaired classes of Claims and Equity Interests or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (2) is feasible; and (3) is in the "best interests" of creditors and stockholders that are impaired under the Plan.

### A. Conditions Precedent to Confirmation of the Plan

It is a condition to confirmation of the Plan that the Clerk of the Bankruptcy Court will have entered the Confirmation Order which, among other things, will:

1.  authorize and approve in all respects the Plan and all transactions contemplated thereby or in connection therewith, including but not limited to (a) the New Charter and New Bylaws; (b) the issuance of the New WHX Common Stock; (c) the assumption and assignment of all executory contracts and unexpired leases that the Debtor may seek to assume and assign under the Plan; and (d) the rejection of all unexpired leases and executory contracts that the Debtor may seek to reject under the Plan; and

2.  be in form and substance and contain findings and conclusions in support of confirmation of the Plan that are reasonably satisfactory to the Debtor.

### B. Conditions Precedent to the Occurrence of the Effective Date

It is a condition to the occurrence of the Effective Date that the following will have occurred on or before July 31, 2005:

1.  the Confirmation Order will have been (a) entered by the Bankruptcy Court, and (b) become a Final Order;

2.  all necessary and material consents, authorizations, and approvals, including, without limitation, consents and authorizations under each Plan Document, will have been given or waived for the transfers and transactions described in the Plan, including, without limitation, the transfers of property and the payments described in the Plan, as applicable;

3.  the Debtor will have purchased directors and officers liability insurance for New WHX in form, substance and amount that is reasonably acceptable to the initial board of directors of New WHX; and

4.  the Debtor will have executed and delivered all documents necessary to effectuate the issuance of New WHX Common Shares.

### C. Requirements of Section 1129(a) of the Bankruptcy Code

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a reorganization plan:

1.  The plan complies with the applicable provisions of the Bankruptcy Code;

2.  The proponent of a plan complies with the applicable provisions of the Bankruptcy Code;

3. The plan has been proposed in good faith and not by any means forbidden by law;

4. Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

5. The proponent of a plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan;

6. The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider;

7. Any governmental regulatory commission with jurisdiction over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval;

8. With respect to each impaired class of claims or interests —

   (a) each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

   (b) if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less the value of such holder's interest in the estate's interest in the property that secures such claims;

9. With respect to each class of claims or interests such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below; see "Section XIII.C.4. Requirements of Section 1129(b) of the Bankruptcy Code");

10. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

    (a) with respect to a claim of a kind specified in sections 507(a)(1) and 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim;

    (b) with respect to a class of claim of the kind specified in sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (A) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (B) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

    (c) with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim

deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

11. If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in section 101 of the Bankruptcy Code;

12. Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan;

13. All fees payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan; and

14. The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtor believes that the Plan meets all the applicable requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting, which has not yet taken place.

## D. Best Interests of Creditors

The Bankruptcy Code requires that any holder of an impaired claim or interest voting against a proposed plan of reorganization must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's operations were terminated and its assets liquidated under chapter 7 of the Bankruptcy Code. To determine what the holders of Claims and Equity Interests in each impaired class would receive if the Debtor was liquidated, the Bankruptcy Court must determine the dollar amount that would be generated from a liquidation of the Debtor's Assets in the context of a hypothetical liquidation. Such a determination must take into account the fact that secured Claims, and any Administrative Claims resulting from the original Chapter 11 Case and from the chapter 7 cases, would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured creditors and make distributions to holders of Equity Interests.

Set forth in Exhibit "B" hereto, is an analysis developed by WHX that assumes that the Chapter 11 Case is converted to a chapter 7 case and the Debtor's Assets are liquidated under the direction of a Bankruptcy Court-appointed trustee. THE LIQUIDATION VALUATIONS HAVE BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DO NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THIS ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF THE DEBTOR FOR ANY PURPOSE. The assumptions used in developing this analysis are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor or a chapter 7 trustee. Accordingly, there can be no assurances that the values assumed in the liquidation analysis would be realized if the Debtor was actually liquidated. In addition, any liquidation would take place in the future at which time circumstances may exist which cannot presently be predicted. A description of the procedures followed and the assumptions and qualifications made by WHX in connection with the liquidation analysis are set forth in the notes thereto.

After consideration of the effect that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to the Debtor's creditors and equity interest holders, including (a) the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee; (b) additional expenses and claims (including any that might be asserted by the PBGC in connection with any action it might pursue or claim it may assert in connection with the WHX Pension Plan), some of which would be entitled to priority, which would be generated during the liquidation, and from the rejection of unexpired leases and executory contracts in connection with the cessation of the operations of the WHX Group; (c) the erosion of the value of the Debtor's Assets in the context of an expedited liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; (d) the adverse effects on the salability of portions of the business that could result from the possible departure of key employees and the loss of customers and vendors; (e) the cost and expense attributable to the time value of money resulting from what is likely to be a more protracted proceeding; and (f) the application of the rule of absolute priority to distributions in a chapter 7 liquidation, the Debtor has determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest in an impaired class entitled to vote with a greater recovery than such holder would have received under a chapter 7 liquidation of the Debtor.

## E. Feasibility

The Debtor believes that New WHX will be able to perform its obligations under the Plan and continue to operate its business without further financial reorganization or liquidation. In connection with confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which requires that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support its belief in the Plan's feasibility, WHX has prepared the Projections for New WHX, as set forth in Exhibit "D" attached to this Disclosure Statement.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AICPA OR THE RULES AND REGULATIONS OF THE SEC. FURTHERMORE, THE PROJECTIONS HAVE NOT BEEN AUDITED BY WHX'S INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS. WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE PROJECTIONS ARE BASED UPON A VARIETY OF ASSUMPTIONS, SOME OF WHICH HAVE NOT BEEN ACHIEVED TO DATE AND MAY NOT BE ACHIEVED IN THE FUTURE, AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES. CONSEQUENTLY, THE PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY WHX, OR ANY OTHER PERSON, THAT THE PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE PROJECTIONS.

## F. Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted it without taking into consideration the votes of any insiders in such class, and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

### 1. <u>Fair and Equitable</u>

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders as follows:

- <u>Secured Creditors</u>.  A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides:  (i) that each of the holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (ii) that each of the holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

- <u>Unsecured Creditors</u>.  A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (i) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (ii) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan.

- <u>Holders of Equity Interests</u>.  A plan is fair and equitable as to a class of equity interests that rejects the plan if the plan provides that:  (i) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such holder is entitled, (B) the fixed redemption price to which such holder is entitled, or (C) the value of the interest; or (ii) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan.

The Debtor believes the Plan is fair and equitable as to secured creditors, because the Plan provides that their Claims will be unimpaired.

The Debtor believes the Plan is fair and equitable as to unsecured creditors because the Plan provides that (a) unsecured creditors in Class 3 (Senior Note Claim) will receive, on the Effective Date, shares of New WHX Common Stock with a value equal to the amount of their Allowed Claim, and (b) unsecured creditors in Class 4 (Other Unsecured Claims) will receive  Cash in an amount equal to their Allowed Unsecured Claim.  Satisfying the "fair and equitable" treatment test under section 1129(b) of the Bankruptcy Code in the event of a "cram down" with respect to holders of Senior Notes Claims and Other Unsecured Claims, however, does not obviate compliance with section 1129(a)(7) of the Bankruptcy Code which requires that a rejecting creditor receive at least as much value under the Plan as such creditor would receive in a chapter 7 liquidation of the Debtor and which, the Creditors Committee argues, would require the payment of accrued postpetition interest at the applicable legal rate as part of the Allowed amount of those Claims.

The Debtor believes the Plan is fair and equitable as to holders of Preferred Equity Interests, because no interests that are junior to Class 5 and Class 6 will receive or retain any property under the Plan.

The Debtor believes the Plan is fair and equitable as to holders of Common Equity Interests that will not receive or retain any property under the Plan, because no interests that are junior to Class 7 will receive or retain any property under the Plan.

## 2. **Unfair Discrimination**

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated and no class receives more than it is legally entitled to receive for its claims or equity interests. The Debtor does not believe that the Plan discriminates unfairly against any impaired class of Claims or Equity Interests.

The Debtor believes that the Plan and the treatment of all classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## VII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords holders of Claims and Equity Interests the greatest opportunity for realization on the Debtor's Assets and, therefore, is in the best interests of such holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) liquidation of the Debtor under chapter 7 of the Bankruptcy Code; or (b) alternative plans of reorganization or liquidation under chapter 11 of the Bankruptcy Code.

## A. **Liquidation Under Chapter 7**

As noted above, the Debtor believes that under the Plan each holder of impaired Claims and Equity Interests will receive property of a value not less than the value such holder would receive in a liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Debtor's belief is based primarily upon extensive consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Claims and Equity Interests, including, but not limited to (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a chapter 7 trustee and professional advisors to the trustee, including investment bankers; (2) the erosion in value of assets in a chapter 7 case in the context of the rapid liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail; (3) the adverse effects on the Debtor's businesses as a result of the likely departure of key employees; and (4) the reduction of value associated with a chapter 7 trustee's operation of the Debtor's businesses. The Debtor's belief is also based upon the liquidation analysis it prepared with the assistance of Jefferies (annexed to this Disclosure Statement as Exhibit "B," the "Liquidation Analysis"). The Liquidation Analysis does not reflect the likely delay in distributions to holders of Claims and Equity Interests in a liquidation scenario, which, if considered, would only further reduce the present value of any liquidation proceeds.

The Debtor believes that any liquidation analysis is speculative as such an analysis is necessarily premised upon assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtor. Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a bankruptcy court would accept the Debtor's conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. This estimate is based solely upon a review of the Debtor's books and records and the Debtor's estimates as to additional Claims(including any that may be asserted by the PBGC in connection with the WHX Pension Plan) that might be filed in the Chapter 11 Case or that would arise in the event of a conversion of the case from chapter 11 to chapter 7. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims that is at the lower end of a range of reasonableness such that, for purposes of the Liquidation Analysis, the largest possible liquidation dividend to holders of Allowed Claims and Equity

Interests can be assessed. The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Equity Interests under the Plan. The annexed Liquidation Analysis is provided solely to disclose to holders the effects of a hypothetical chapter 7 liquidation of the Debtor, subject to the assumptions set forth therein.

To the extent that Confirmation of the Plan requires the establishment of amounts for the chapter 7 liquidation value of the Debtor, funds available to pay Claims, and the reorganization value of the Debtor, the Bankruptcy Court will determine those amounts at the Confirmation Hearing.

## B. Alternative Plan of Reorganization or Liquidation

The Debtor may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtor's Assets could be sold in an orderly fashion over a more extended period of time than in liquidations under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and high administrative costs. Because a trustee is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a trustee must be appointed. Any distribution to the holders of Claims and Equity Interests under a chapter 11 liquidation plan probably would be delayed substantially. Therefore, the Debtor believes that a chapter 11 liquidation would not produce Distributions as favorable as those under the Plan.

## VIII.

## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE PRICES AT WHICH THE DEBTOR CAN SELL ITS GOODS AND SERVICES, CURRENCY EXCHANGE RATE FLUCTUATIONS, THE DEVELOPMENT OF NEW TECHNOLOGIES, AN ECONOMIC DOWNTURN, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS, TERRORIST ACTIONS OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, ACTIONS OF GOVERNMENTAL BODIES, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING EITHER OF THE DEBTOR OR NEW WHX, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

## A.     Certain Bankruptcy Considerations

### 1.     Risk of Liquidation

If the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a chapter 7 liquidation case, or that any alternative plan of reorganization would be on terms as favorable to holders of Claims and Preferred Equity Interests as the terms of the Plan.  If a liquidation or protracted reorganization were to occur, the distributions to holders of Allowed Claims and Allowed Preferred Equity Interests could be drastically reduced.  The Debtor believes that, in a liquidation under chapter 7, holders of Allowed Claims and Allowed Preferred Equity Interests would receive substantially less because of the inability in a liquidation to realize the greater going-concern value of the Debtor's Assets.  In addition, administrative expenses of a chapter 7 trustee and the trustee's attorneys, accountants and other professionals would cause a substantial erosion of the value of any potential estate.  Furthermore, certain Claims would arise by reason of the liquidation and from the rejection of unexpired leases and other executory contracts and possibly also in connection with the WHX Pension Plan.

### 2.     Risk of Non-Confirmation of the Plan; Feasibility, Best Interests of Creditors and "Cramdown"

Certain holders of Claims and Equity Interests will receive no distribution under, and are therefore deemed to have rejected, the Plan.  Accordingly, the Plan will not be confirmed unless the "cramdown" requirements of Bankruptcy Code section 1129(b) are met.  Even if such requirements are met, however, the Bankruptcy Court, which can exercise substantial discretion, may determine that the Plan does not meet other requirements for confirmation under the Bankruptcy Code. For example, section 1129(a) requires, among other things, a demonstration that confirmation of the Plan will not be followed by the liquidation or need for the further financial reorganization of the Debtor, except as contemplated by the Plan, and that the value of distributions to creditors and equity security holders who vote to reject the Plan, or are deemed to have rejected the Plan, are not less than the value of distributions such creditors and equity security holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtor believes that the Plan will meet the requirements for confirmation, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

## B.     Risks Relating to New WHX's Financial Condition

### 1.     Historical Financial Information Will Not Be Comparable

As a result of the consummation of the Plan and the transactions contemplated by the Plan, the capital structure of New WHX will differ substantially from the Debtor's existing capital structure.  In addition, New WHX will be subject to the fresh start accounting rules.  See "Section V.B. New WHX — Projected Financial Information."  Accordingly, the financial condition and results of New WHX and its subsidiaries (the "Company") from and after the Effective Date will not be comparable to the financial condition or results of operations reflected in the Debtor's historical financial statements.

### 2.     Ability to Service Indebtedness

New WHX's future capital requirements could vary significantly and may be affected by general economic conditions, industry trends, performance, and many other factors that are not within New WHX's control. There can be no assurance that New WHX will be able to obtain financing in the future.  Even if the Plan is approved and consummated, there can be no assurance that New WHX will not experience losses.  New WHX's ability to become profitable and generate cash flow will likely depend upon New WHX meeting or exceeding the results forecasted in the Projections.  However, there can be no assurance that New WHX will be able to accomplish such results.

### 3. Restrictions Imposed By Subsidiary's Indebtedness

The H&H loan agreements contain provisions that likely will restrict H&H from making dividends or other cash payments to New WHX. These restrictions may, among other things, hinder or prevent New WHX from (a) responding to changing business and economic conditions; (b) engaging in transactions that might otherwise be considered beneficial; and (c) implementing its business plan.

### 4. Inherent Uncertainty of Financial Projections

The Projections attached as Exhibit "D" to this Disclosure Statement were developed by management in connection with the planning, negotiation and development of the Plan. The Projections are intended to illustrate the estimated effects of the Plan and certain related transactions on the results of operations, cash flow and financial position of New WHX for the periods indicated. The Projections are qualified by the introductory paragraphs thereto and the accompanying assumptions, and must be read in conjunction with such introductory paragraphs and assumptions, which constitute an integral part of the Projections. The Projections are based upon a variety of assumptions as set forth therein, and the Company's future operating results are subject to and likely to be affected by a number of factors, including significant business, economic, regulatory and competitive uncertainties, many of which are beyond the Company's control. Accordingly, actual results may vary materially from those shown in the Projections.

The Debtor's management believes that the industries in which the Company will operate are volatile due to numerous factors, including the risks described below at "Subsection VIII.C. Risks Relating to the Company's Businesses," all of which make accurate forecasting very difficult. Although it is not possible to predict all risks associated with the Projections and their underlying assumptions, there are some risks that management is presently able to identify. The Projections assume that all aspects of the Plan will be successfully implemented on the terms set forth in this Disclosure Statement and that the publicity associated with the bankruptcy proceeding contemplated by the Plan will not adversely affect the Company's operating results. There can be no assurance that these two assumptions are accurate, and the failure of the Plan to be successfully implemented, or adverse publicity, could have a materially detrimental effect on the Company's businesses, results of operations, and financial condition and, as a consequence, the value of New WHX and the New WHX Common Stock.

Moreover, the Projections were not prepared with a view towards public disclosure or with a view towards complying with the guidelines established by the AICPA with respect to prospective financial information. New WHX does not intend to update or otherwise revise its projections to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events. In the view of New WHX's management, however, the Projections were prepared on a reasonable basis and represent a reasonable view of the expected future financial performance of the Company after the Effective Date. Nevertheless, the Projections should not be regarded as a representation by the Company, the Debtor, New WHX, or any other person that the Projections will be achieved and holders are therefore cautioned not to place undue reliance on the projected financial information contained in this Disclosure Statement.

### C. Risks Relating to the Company's Businesses

### 1. Highly Competitive Industry with Participants that Have Greater Resources

The Company's continued operations and viability are subject to significant competition from numerous sources and entities that may enjoy certain competitive advantages, including greater name recognition; greater financial, technical, marketing and other resources; a larger installed base of customers; and well-established relationships with current and potential customers.

### 2. Commodity Price Risk; Related Risks

The Company is exposed to market risk or price fluctuation related to the purchase of natural gas, electricity, precious metals, steel products and certain non-ferrous metals used as raw materials. Therefore, the results of operations of the Company may be adversely affected during periods in which either the prices of such commodities are unusually high or their availability is restricted. The Company holds unhedged precious metal positions that are subject to market fluctuations. The portion of the precious metal inventory that has not been hedged and, therefore, is subject to price risk is included in inventory using the last-in, first-out method of inventory calculation. To the extent that additional precious metal inventory is required to support the Company's operations, precious metals are purchased and immediately sold using forward or future contracts with major financial institutions to eliminate the economic risk of price fluctuations.

### 3. Industry Trends

A decline in the general economic and business conditions and industry trends could continue to adversely affect the Company's results of operations.

### D. Factors Affecting the Value of Securities to be Issued Under the Plan

#### 1. No Established Market for New WHX Common Stock; Volatility Is Possible

No established market exists for the New WHX Common Stock. Although New WHX is expected to apply for quotation of the New WHX Common Stock on a national exchange as soon as practicable after the Effective Date when New WHX meets the listing requirements, there can be no assurance that the minimum requirements for quotation will be met, and even if such application is granted, that an active market for the New WHX Common Stock will develop or, if any such market does develop, that it will continue to exist. Transfer restrictions contained in the New Charter will generally prevent any person from rapidly acquiring significant amounts of New WHX Common Stock, in each case for up to ten years after the Effective Date. These transfer restrictions could hinder development of an active market for New WHX Common Stock. See Article V Section A.1(e) "Restrictions on Transfer of New WHX Common Stock." In addition, there can be no assurance as to the degree of price volatility in any market for the New WHX Common Stock that does develop. If New WHX is not able to list such securities on a national exchange, it is expected to cooperate with any registered broker-dealer who may seek to initiate price quotations for the New WHX Common Stock on the OTC Bulletin Board. Again, however, no assurance can be made that such securities will be quoted on the OTC Bulletin Board or that an active trading market will exist. Moreover, the New WHX Common Stock will be issued pursuant to the Plan to holders of prepetition (a) Class 3 Senior Notes Claims, (b) Class 5 Series A Interests and (c) Class 6 Series B Interests, and some of these holders may prefer to liquidate their investment rather than to hold it on a long-term basis. Accordingly, it is anticipated that the market for the New WHX Common Stock will be volatile, at least for an initial period after the Effective Date.

The valuation of New WHX Common Stock contained in this Disclosure Statement is not an estimate of the prices at which the New WHX Common Stock may trade in the market, and the Debtor has not attempted to make any such estimate in connection with the development of the Plan. The value of the New WHX Common Stock ultimately may be substantially higher or lower than reflected in the valuation assumptions provided in this Disclosure Statement. In addition, the market price of the New WHX Common Stock may be subject to significant fluctuations in response to numerous factors, including variations in New WHX's consolidated annual or quarterly financial results or those of its competitors, changes by financial analysts in their estimates of the future earnings of New WHX, conditions in the economy in general or in the manufacturing industry in particular or unfavorable publicity. The stock market also has, from time to time, experienced significant price and volume fluctuations that have been unrelated to the operating performance of companies with publicly traded securities. No assurance can be given as to the market prices for New WHX Common Stock that will prevail following the Effective Date.

**2.** **Dividends Are Not Anticipated; Lack of Dividends May Limit Investor Demand**

New WHX does not anticipate paying any dividends on the New WHX Common Stock in the foreseeable future. Such lack of dividend prospects may have an adverse impact on the market demand for New WHX Common Stock as certain institutional investors may invest only in dividend-paying equity securities or may operate under other restrictions that may prohibit or limit their ability to invest in the New WHX Common Stock.

**3.** **Certain Provisions Will Have Anti-Takeover Effects**

Certain provisions of the New Charter and New Bylaws, as well as the Delaware General Corporation Law, may have the effect of delaying, deferring or preventing a change in control of New WHX. Such provisions, including ones restricting the transfers of New WHX Common Stock, may make it more difficult for anyone to make a tender offer or otherwise acquire substantial amounts of the New WHX Common Stock or to launch other takeover attempts that a stockholder might consider to be in such stockholder's best interest, without the approval of New WHX's board of directors. See Article V Section A.1(e) "Restrictions on Transfer of New WHX Common Stock."

**IX.**

**CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN**

**A.** **General**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. THE DESCRIPTION IS BASED ON THE IRC, TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT AND ALL SUBJECT TO CHANGE, POSSIBLY WITH RETROACTIVE EFFECT. CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION COULD CAUSE THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN IMPORTANT RESPECTS UNCERTAIN. NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM DEBTOR'S COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR HOLDERS OF CLAIMS OR EQUITY INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS, NON-U.S. TAXPAYERS, PASS-THROUGH ENTITIES, REGULATED INVESTMENT COMPANIES, PERSONS WHO MARK-TO-MARKET THE CLAIMS OR WHO HOLD CLAIMS AS PART OF A "STRADDLE", A "HEDGE AGAINST CURRENCY RISK" OR A "CONVERSION TRANSACTION", NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF EQUITY INTERESTS IN THE DEBTOR. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.

FOR THESE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE

**INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR EQUITY INTEREST. HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.      Federal Income Tax Consequences to the Debtor**

**1.      Cancellation of Debt Income**

The discharge of the Debtor's obligations under the Senior Notes and, if applicable, unsecured claims, will result in cancellation of debt ("COD") income to the Debtor if and to the extent the value of the New WHX Common Stock distributed on account of such Senior Notes is less than the amount owed to holders of the Senior Notes.  Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates COD, which must be included in the debtor's income.  However, COD income is not recognized by a taxpayer that is a debtor in a chapter 11 case if the discharge is pursuant to a plan approved by the court.  The Plan, if approved, would enable the Debtor to qualify for this bankruptcy exclusion rule with respect to COD income, if any, triggered by the Plan.  In addition, COD income does not include an obligation to the extent the payment of such indebtedness would have given rise to a deduction or an obligation under an executory contract, such as a lease, where no liability has yet accrued.

If debt is discharged in a chapter 11 case, however, certain tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the indebtedness forgiven.  Tax attributes subject to reduction include:  (a) NOLs and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's depreciable and non-depreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards.

A debtor may elect to avoid the prescribed order of attribute reduction and instead reduce the basis of certain property first.  In the case of affiliated corporations filing a consolidated return (such as the Debtor and its consolidated subsidiaries), the attribute reduction rules apply first to the separate attributes of or allocable to the particular corporation whose debt is being discharged, and then to certain attributes of other members of the group.  Accordingly, COD income of the Debtor would result first in the reduction of any consolidated NOLs and other attributes, including asset basis, attributable to the Debtor, and then of consolidated NOLs and/or basis attributable to other members of the consolidated group, after use of any such NOLs to determine the consolidated group's taxable income for the tax year in which the debt is discharged.

The Debtor believes that the value of New WHX Common Stock distributed to holders of Allowed Senior Notes Claims will be at least equal to the adjusted issue price (principal plus accrued interest) of the Senior Notes, as of the Effective Date of the Plan, although the value of WHX Common Stock is subject to some uncertainty.  See "A.  Summary of Anticipated Distribution Under the Plan".  If the value of the New WHX Common Stock distributed to holders of Allowed Senior Notes Claims is at least equal to the adjusted issue price of the Senior Notes, the Debtor should not realize any COD income, and thus, New WHX should not be required to reduce its tax attributes as set forth above.

**2.      Limitation on NOL Carryforwards**

(a)      General

Section 382 of the IRC provides rules limiting the utilization of a corporation's NOLs and other losses, deductions and credits following a more than 50% change in ownership of a corporation's equity (an "ownership change").  An ownership change will occur with respect to the Debtor in connection with the Plan.  Therefore,

the NOLs of New WHX will be limited by Section 382 of the IRC, unless the Bankruptcy Exception (described below) applies to the transactions contemplated by the Plan. Unless the Bankruptcy Exception applies, the amount of post-ownership change annual taxable income of New WHX that can be offset by the pre-ownership change NOLs of the Debtor generally cannot exceed an amount equal to the product of (a) the applicable federal long-term tax-exempt rate in effect on the date of the ownership change and (b) the value of the Debtor's stock immediately prior to the Effective Date of the Plan (the "Annual Limitation"). Notwithstanding the foregoing, the Annual Limitation is increased, because the value of the Debtor's stock for purposes of this computation would reflect the increase, if any, in value resulting from any surrender or cancellation of any Claims in the Chapter 11 Case. For instance, if the equity value of New WHX were $110 million and the applicable U.S. federal long-term tax-exempt rate in effect on the date of the ownership change were 4.5%, then, unless the Bankruptcy Exception is applicable, the Annual Limitation would be $4.95 million.

Any unused Annual Limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year. However, if New WHX does not continue its historic business or use a significant portion of its assets in a new business for two years after the ownership change (the "Business Continuity Requirement"), the Annual Limitation resulting from the ownership change is zero.

In addition, the Annual Limitation may be increased if the Debtor has a net unrealized built-in gain at the time of an ownership change. If, however, the Debtor has a net unrealized built-in loss at the time of an ownership change, the Annual Limitation will apply to the recognition of built-in loss upon a sale, or the claim of depreciation or amortization with respect to built-in loss property during the five-year period following the Effectiveness of the Plan. Although the future is subject to some uncertainty, the Debtor anticipates that it will be in a net unrealized built-in-loss position at the time the Plan is implemented.

(b)     Bankruptcy Exception

Under section 382(l)(5) of the IRC (the "Bankruptcy Exception"), the Annual Limitation should generally not apply to limit the utilization of New WHX's NOLs or built-in losses following an ownership change if the New WHX Common Stock owned immediately after the ownership change by those Persons who were stockholders of the Debtor immediately before the ownership change, together with New WHX Common Stock received by certain holders of Allowed Claims pursuant to the Plan, comprise 50% or more of the value of all of the New WHX Common Stock outstanding immediately after the ownership change. Stock issuable after the Effective Date to holders of Allowed Preferred Equity Interests pursuant to Warrants issued to such holders is not taken into account for purposes of this test. New WHX Common Stock received by such Allowed Claim holders will be included in the 50% calculation if, and to the extent that, such holders constitute "qualified creditors." A "qualified creditor" is a holder of an Allowed Claim that (a) was held by such holder since the date that is 18 months before the date on which the Debtor first filed its petition with the Bankruptcy Court or (b) arose in the ordinary course of business and is held by the Person who at all times held the beneficial interest in such Allowed Claim. In determining whether the Bankruptcy Exception applies, certain holders of Allowed Claims that own directly or indirectly less than 5% of the total fair market value of New WHX Common Stock received pursuant to the Plan are presumed to have held their Claims since the origination of such Claims.

The Debtor currently expects that it will qualify for the Bankruptcy Exception. If the Bankruptcy Exception should apply, a subsequent ownership change with respect to New WHX occurring within two years after the Effective Date would result in the reduction of the Annual Limitation that would otherwise apply to the subsequent ownership change to zero. Thus, an ownership change within two years after the Effective Date would eliminate the ability of New WHX to use NOLs thereafter. However, if the Bankruptcy Exception applies, the Business Continuity Requirement does not apply, although a lesser business continuation requirement may apply under Treasury Regulations.

Although the Annual Limitation would not apply to restrict the deductibility of NOLs if the Bankruptcy Exception applied, NOLs of New WHX would be reduced by any interest paid or accrued by the Debtor during the three taxable years preceding the taxable year in which the ownership change occurs and during the portion

of the taxable year of the ownership change preceding the ownership change with respect to all Allowed Claims converted into New WHX Common Stock.

If it did qualify for the Bankruptcy Exception, New WHX could nevertheless elect to not have the Bankruptcy Exception apply, in which event the Annual Limitation as adjusted for the surrender of Claims pursuant to a Chapter 11 Case would apply.

The Debtor currently expects that it will qualify for the Bankruptcy Exception and that it will not elect to not have the Bankruptcy Exception apply.

Accordingly, in order to avoid subsequent ownership changes, the New Charter will contain a "5% Ownership Limit," effective until the Restriction Release Date, pursuant to which certain transfers of New WHX's equity will be limited. See Article V Section A.1(e) "Restrictions on Transfer of New WHX Common Stock." The purpose of such limit is to reduce the risk that any change in the ownership of New WHX Common Stock may eliminate or limit the benefits of federal income tax attributes of New WHX.

Although the Annual Limitation will not apply to restrict the deductibility of NOLs if the Bankruptcy Exception applies, NOLs of the New WHX will be reduced by any interest paid or accrued by the Debtor during the three taxable years preceding the taxable year in which the ownership change occurs and during the portion of the taxable year of the ownership change preceding the ownership change with respect to all Allowed Claims converted into New WHX Common Stock.

(c)     Alternative Minimum Tax

In general, a federal alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular federal income tax purposes by available NOL carryforwards, a corporation is generally entitled to offset no more than 90% of its AMTI with NOL carryforwards (as recomputed for AMT purposes). Accordingly, New WHX's use of its NOLs may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation (or a consolidated group) undergoes an ownership change and is in a net unrealized built-in loss position on the date of the ownership change, the corporation's (or group's) aggregate tax basis in its assets may be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. Accordingly, if the Debtor is in a net unrealized built-in loss position on the Effective Date, for AMT purposes the tax benefits attributable to basis in assets may be reduced.

Any AMT that the corporation pays generally will be allowed as a nonrefundable credit against its regular federal income tax liability in future taxable years when the corporation is no longer subject to AMT.

**3.     Other Federal Income Tax Consequences**

Other federal income tax consequences to the Debtor may result depending on the terms of any additional restructuring transactions that occur with respect to the Debtor.

**C.     Federal Income Tax Consequences to Holders of Claims and Equity Interests**

The federal income tax consequences of the Plan to a holder of a Claim or Equity Interest will depend, in part, on whether a Claim constitutes a "tax security" for federal income tax purposes, what type of consideration was received in exchange for the Claim or Equity Interest, whether the holder reports income on the accrual or cash basis, whether the holder has taken a bad debt deduction or worthless stock or security

deduction with respect to the Claim and whether the holder receives distributions under the Plan in more than one taxable year.

### 1. Definition of Securities

There is no precise definition of the term "security" under the federal income tax law. Rather, all facts and circumstances pertaining to the origin and character of a claim are relevant in determining whether it is a security. Nevertheless, courts and IRS administrative authority generally have held that corporate debt evidenced by a written instrument and having an original average weighted maturity of ten years or more will be considered a tax security. Corporate debt with an original average weighted maturity of less than five years will not be considered a tax security. Corporate debt with an original average weighted maturity of more than five years but less than ten years may be considered a tax security, based on the facts and circumstances. The Senior Notes (originally issued on April 7, 1998 with an original maturity date of April 15, 2005) had original maturities of approximately seven years and may be tax securities.

### 2. Holders of Claims Constituting Tax Securities or Equity Interests Receiving New WHX Common Stock or New WHX Common Stock and Warrants

The receipt of New WHX Common Stock in satisfaction of an Allowed Claim that constitutes a "security" for U.S. federal income tax purposes and the receipt of New WHX Common Stock and Warrants in satisfaction of Allowed Preferred Equity Interests will each constitute a tax-free recapitalization for U.S. Federal income tax purposes. Pursuant to such a recapitalization, the holder of such Claim constituting a tax security or Preferred Equity Interest generally should not recognize gain or loss upon the exchange (but will recognize any gain to the extent of any Cash and the fair market value of any consideration received other than New WHX Common Stock and Warrants); such holder's aggregate tax basis in the New WHX Common Stock and Warrants (apart from any portion thereof allocable to interest) should equal the holder's basis in its Claim or Preferred Equity Interest; and the holding period for the New WHX Common Stock and Warrants (apart from any portion allocable to interest) should include the holding period of the Allowed Claim or Preferred Equity Interest surrendered therefor. The holder's tax basis in any New WHX Common Stock and Warrants allocable to interest will equal the fair market value of the New WHX Common Stock and Warrants and the holding period of such stock and warrants will begin on the day after the day of receipt. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### 3. Holders of Claims Receiving Cash

Under the Plan, holders of certain Allowed Claims may receive Cash in satisfaction of their Claims. A holder of an Allowed Claim who receives solely Cash in satisfaction of such holder's Claim generally should recognize gain or loss (if any) on the receipt of the Cash equal to the difference, if any, between the amount of Cash received (except that amounts, if any, allocable to interest on the Claim will be treated as the receipt of interest) and the holder's basis in the Claim. Any gain or loss recognized will be capital or ordinary, depending on the status of the Claim in the holder's hands, including whether the Claim constitutes a market discount bond in the holder's hands.

Generally, any gain or loss recognized by a holder of an Allowed Claim will be a long-term capital gain or loss if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount.

### 4. Holders of Claims Not Constituting Tax Securities

The receipt of New WHX Common Stock and/or Cash in exchange for any Claim that is not a tax security would not constitute a "recapitalization" or other "reorganization" transaction for U.S. federal income

tax purposes. Accordingly, a holder of a Claim not constituting a tax security would recognize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and/or the fair market value of New WHX Common Stock received by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (b) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest).

Generally, any gain or loss recognized by a holder of a Claim not constituting a tax security will be a long-term capital gain if the Claim is a capital asset in the hands of the holder and the holder has held such Claim for more than one year, unless the holder had previously claimed a bad debt or worthless securities deduction or the holder had accrued market discount with respect to such Claim. See "Market Discount" below for a discussion of the character of any gain recognized from a Claim with accrued market discount. Such a holder's tax basis for any New WHX Common Stock received under the Plan generally should equal its fair market value. The holding period for any New WHX Common Stock received under the Plan by a holder of a Claim not constituting a tax security generally should begin on the day following the day of receipt.

**D.     Certain Other Tax Considerations for Holders of Claims**

**1.     Pre-Effective Date Interest**

The Plan provides that each holder's recovery is received first in exchange for the principal amount of the holder's Allowed Claim, and then in respect of the unpaid pre-Effective Date interest (if any) on such Allowed Claim. This treatment is not certain to apply for federal income tax purposes, however, and a holder of a Claim that was not previously required to include in its taxable income any accrued but unpaid pre-Effective Date interest on the Claim may be treated as receiving taxable interest (to the extent any consideration it receives under the Plan is properly allocable to such interest for federal income tax purposes). A holder previously required to include in its taxable income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan.

**2.     Bad Debt Deduction**

A holder who, under the Plan, receives in respect of a Claim an amount less than the holder's tax basis in the Claim may or may not be entitled in the year of receipt (or in an earlier year) to a bad debt deduction in some amount under section 166(a) of the IRC. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**3.     Market Discount**

A holder that purchased its Claim from a prior holder with market discount will be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

To the extent that a holder's Claim is exchanged in a "recapitalization" for U.S. federal income tax purposes, any accrued market discount not treated as ordinary income upon such exchange should carry over, on an allocable basis, to any New WHX Common Stock received, such that any gain recognized by the holder upon a subsequent disposition of such New WHX Common Stock would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

### 4.     Installment Method

A holder of a Claim constituting an installment obligation for tax purposes may be required to recognize currently any gain remaining with respect to the obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold, or otherwise disposed of within the meaning of Section 453B of the IRC.

### 5.     Information Reporting and Backup Withholding

All distributions under the Plan will be subject to applicable U.S. federal income tax reporting and withholding.  The IRC imposes "backup withholding" on certain "reportable" payments to certain taxpayers, including payments of interest.  Under the IRC's backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan, unless the holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.  Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.  A holder of a Claim may be required to establish an exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

### E.     Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES.  ACCORDINGLY, HOLDERS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

### X.

### APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS

### A.     General

No registration statement will be filed under the Securities Act, or any state securities laws with respect to the offer and distribution under the Plan of New WHX Common Stock.  The Debtor believes that the provisions of section 1145(a)(1) of the Bankruptcy Code exempt the offer and distribution of such securities under the Plan from federal and state securities registration requirements.

### B.     Bankruptcy Code Exemptions from Registration Requirements

### 1.     Initial Offer and Sale of Securities

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and state securities laws if three principal requirements are satisfied:

- the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, an affiliate participating in a joint plan with the debtor or a successor to the debtor under the plan;

- the recipients of the securities must hold a prepetition or administrative expense claim against the debtor or an interest in the debtor; and

- the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

The Debtor believes that the offer and sale of New WHX Common Stock under the Plan satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code and, therefore, are exempt from registration under the Securities Act and state securities laws.

## 2. Subsequent Transfers of Securities

In general, all resales and subsequent transactions in New WHX Common Stock distributed under the Plan will be exempt from registration under the Securities Act pursuant to section 4(1) of the Securities Act, unless the holder thereof is deemed to be an "underwriter" with respect to such securities, an "affiliate" of the issuer of such securities or a "dealer."  Section 1145(b) of the Bankruptcy Code defines four types of "underwriters:"

- Persons who purchase a claim against, an interest in, or a claim for administrative expense against the debtor with a view to distributing any security received in exchange for such a claim or interest ("accumulators");

- Persons who offer to sell securities offered under a plan for the holders of such securities ("distributors");

- Persons who offer to buy securities from the holders of such securities, if the offer to buy is (a) with a view to distributing such securities and (b) made under a distribution agreement; and

- a Person who is an "issuer" with respect to the securities, as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any "affiliate" of the issuer, which means any Person directly or indirectly through one or more intermediaries controlling, controlled by or under common control with the issuer.  Under section 2(12) of the Securities Act, a "dealer" is any Person who engages either for all or part of such person's time, directly or indirectly, as agent, broker or principal in the business of offering, buying, selling or otherwise dealing or trading in securities issued by another Person.  Whether or not any particular Person would be deemed to be an "underwriter" or an "affiliate" with respect to any security to be issued pursuant to the Plan or to be a "dealer" would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtor expresses no view as to whether any Person would be deemed to be an "underwriter" or an "affiliate" with respect to any security to be issued pursuant to the Plan or to be a "dealer."

SEC Rule 144 provides an exemption from registration under the Securities Act for certain limited public resales of unrestricted securities by "affiliates" of the issuer of such securities.  Rule 144 allows a holder of unrestricted securities that is an affiliate of the issuer of such securities to sell, without registration, within any three-month period a number of shares of such unrestricted securities that does not exceed the greater of (i) 1% of the number of outstanding securities in question and (ii) the average weekly trading volume in the securities in question during the four calendar weeks preceding the date on which notice of such sale was filed pursuant to Rule 144, subject to the satisfaction of certain other requirements of Rule 144 regarding the manner of sale, notice requirements and the availability of current public information regarding the issuer.  The Debtor believes that, pursuant to section 1145(c) of the Bankruptcy Code, New WHX Common Stock to be issued pursuant to the Plan will be considered unrestricted securities for purposes of Rule 144.

In connection with prior bankruptcy cases, the staff of the SEC has taken the position that resales by accumulators and distributors of securities distributed under a plan of reorganization are exempt from registration under the Securities Act if effected in "ordinary trading transactions." The staff of the SEC has indicated in this context that a transaction may be considered an "ordinary trading transaction" if it is made on an exchange or in the over-the-counter market and does not involve any of the following factors:

- either (A) concerted action by the recipients of securities issued under a plan in connection with the sale of such securities or (B) concerted action by distributors on behalf of one or more such recipients in connection with such sales;

- the use of informational documents concerning the offering of the securities prepared or used to assist in the resale of such securities, other than a bankruptcy court-approved disclosure statement and supplements thereto and documents filed with the SEC pursuant to the Exchange Act; or

- the payment of special compensation to brokers and dealers in connection with the sale of such securities designed as a special incentive to the resale of such securities (other than the compensation that would be paid pursuant to arms-length negotiations between a seller and a broker or dealer, each acting unilaterally, and not greater than the compensation that would be paid for a routine similar-sized sale of similar securities of a similar issuer).

*The Debtor has not sought the views of the SEC on this matter, and therefore, no assurance can be given regarding the proper application of the "ordinary trading transaction" exemption described above. Any Persons intending to rely on such exemption are urged to consult their own counsel as to the applicability thereof to any particular circumstances.*

**Given the complex nature of the question of whether a particular Person may be an "affiliate" of New WHX or an "underwriter" with respect to the New WHX Common Stock to be distributed pursuant to the Plan, the Debtor makes no representations concerning the right of any Person to trade in the New WHX Common Stock to be distributed pursuant to the Plan. The Debtor recommends that holders of Claims and Preferred Equity Interests consult their own counsel concerning whether they may freely trade such securities.**

### 3. Subsequent Transfers Under State Law

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the New WHX Common Stock.

## C. Certain Transactions by Stockbrokers

Under section 1145(a)(4) of the Bankruptcy Code, stockbrokers effecting transactions in New WHX Common Stock prior to the expiration of 40 days after the first date on which such securities were bona fide offered to the public by New WHX or by or through an underwriter are required to deliver to the purchaser of such securities a copy of this Disclosure Statement (and supplements hereto, if any, if ordered by the Bankruptcy Court) at or before the time of delivery of such securities to such purchaser. In connection with prior bankruptcy cases, the staff of the SEC has taken so-called "no-action" positions with respect to noncompliance by stockbrokers with such requirement in circumstances in which the debtor was, and the reorganized debtor was to continue to be, subject to and in compliance with the periodic reporting requirements of the Exchange Act. *The views of the SEC on this matter, however, have not been sought by the Debtor, and therefore, no assurance can be given regarding the possible consequences of noncompliance by stockbrokers with the disclosure statement delivery requirements of section 1145(a)(4) of the Bankruptcy Code. Stockbrokers are urged to consult their own counsel with respect to such requirements.*

# XI.

## RECOMMENDATION AND CONCLUSION

The Debtor believes that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all holders of Claims and Equity Interests in voting classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their ballots so that they will be received on or before the Voting Deadline.

Dated:  June 7, 2005 **Respectfully submitted,**

WHX Corporation

By: _____
     Neale X. Trangucci
     Chief Executive Officer